STATE OF CONNECTICUT *v.* TODD C. MORRILL
(11343)

PETERS, C. J., HEALEY, SHEA, SANTANIELLO and CALLAHAN, Js.

508

Argued June 12—decision released September 10, 1985

*James A. Wade,* with whom were *Sally Kemp-Orino,* and, on the brief, *Sally S. King,* for the appellant (defendant).

*Carl Schuman,* assistant state's attorney, with whom were *John T. Redway,* state's attorney, and, on the brief, *Erin M. Kallaugher,* law student intern, for the appellee (state).

SHEA, J. The defendant has appealed from his conviction by a jury of murder in violation of General Statutes § 53a-54a. His numerous claims of error may be generally classified as relating to: (1) the sufficiency of the evidence; (2) the grand jury proceedings; (3) the denial of his right to speedy trial as a result of both pre-indictment and post-indictment delay; (4) the admission of his claimed confession based upon conduct implying a tacit admission; (5) the denial of his motion to suppress certain evidence obtained pursuant to a search warrant claimed to have been issued without probable cause; (6) the failure of the state fully and timely to disclose certain exculpatory evidence; (7) the admission of certain evidence claimed to be (a) irrelevant and (b) incompetent; and (8) the denial of his motion in arrest of judgment based upon lack of jurisdiction over the subject matter of the crime. We find error only in the admission of the testimony concerning the defendant's tacit confession to the murder, which we conclude was in violation of *Doyle* v. *Ohio*, 426 U.S. 610, 96 S. Ct. 2240, 49 L. Ed. 2d 91 (1976), and remand for a new trial. With respect to those issues that would warrant a judgment of acquittal and dismissal, we find no error. We also discuss those remaining issues which are likely to arise upon a retrial, for the purpose of providing guidance to the trial court.

## I

The defendant claims that his motion for an acquittal should have been granted because there was insufficient evidence to prove that he had murdered the victim. We find no error in the denial of this motion.

From the evidence the jury could reasonably have found the following facts: On Saturday, November 18, 1978, at about 2 p.m. the body of a seventeen year old girl, Linda McLaughlin, was found by a hunter in a remote section of Portland, partially hidden under a

spruce tree. Seven stab wounds had been inflicted upon her torso and one slash wound to her throat. Her death had probably occurred on Friday, November 17, between 12 and 8 a.m.

The victim had known the defendant since she was fifteen years old. She had started dating him steadily in the fall of 1978, but had also dated other young men for a few weeks preceding her death. Within the week before her death, the victim had expressed a desire to break off her relationship with the defendant. They had argued frequently and, on one occasion, two to three weeks before the crime, the defendant had threatened her with a buck knife he regularly carried.

The defendant was engaged in selling drugs and he supplied the victim with drugs for her own use as well as for sale to others at the high school she attended. On Wednesday, November 15, the victim expressed concern that if she were "short" from previous sales the defendant would "kill" her. On Thursday, November 16, she said she had some drugs she wanted to sell quickly because she owed the defendant money and that if she were "five cents short, he'll kill me." Between 3:30 and 4 p.m. that day the victim left her home with the defendant in a silver-gray Mercury Cougar that he frequently drove. In the evening, the victim and the defendant together visited Dean Wilson and Mary Wynne at their apartment. The four young people consumed some drugs, including "THC," that probably contained the chemical phencyclidene, which may induce unsteady, violent and assaultive behavior. The defendant and the victim left the apartment about 8 p.m. with the stated intention of going to the Brave Bull Cafe in South Windsor.

The dirt road leading to the site where the body of the victim was found was muddy, full of ruts and bordered by bushes that could scratch a car. The Mercury

Cougar driven by the defendant was found, when it was seized after the body had been discovered, to have scratches along the side and dents under the carriage and gas tank. Undercoating material found on two rocks near the site of the body was of the same kind as that on the underside of the Mercury. Some mud and fresh soil clinging to the bottom of that vehicle was similar in color, texture and mineral content to soil samples taken from the road that passed the site of the body. A piece of amber glass found in a grease spot in the right front wheel well of the car was similar to three small glass fragments found near the body.

A search of the defendant's bedroom on November 19, the day after discovery of the body, disclosed, on the floor of that room, several needles recently detached from a Colorado blue spruce. The victim's body had been found lying under a Colorado blue spruce tree. In this search the police also seized a boot of the defendant that bore a stain of human blood. They also took a coat containing a blood stain, which the defendant's father attempted to conceal at the time of the search. The blood stain on the coat was analyzed and found to match the blood type of the victim.

After the victim's death, the defendant no longer carried the buck knife he had previously worn on his hip. The defendant told Dean Wilson initially that he and the victim had argued after leaving the apartment on Thursday night, that he had left her near the Brave Bull Cafe because she had decided to hitchhike to her home, and that he had then given her his knife. Some time later he told Wilson that the victim had spent the night at his house and that he had dropped her off at the Dairy Queen in Portland early Friday morning. At the trial, the defendant presented the testimony of his father and others in support of this second account of the victim's disappearance. The defendant also made

some statements to another witness, a fellow detainee at the Hartford jail, that could be construed to implicate him in the crime.

In reviewing a sufficiency of the evidence claim, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. See *Johnson* v. *Louisiana,* 406 U.S. [356, 362, 92 S. Ct. 1620, 32 L. Ed. 2d 152 (1972)]." (Emphasis in original.) *State* v. *Scielzo,* 190 Conn. 191, 197, 460 A.2d 951 (1983), quoting *Jackson* v. *Virginia,* 443 U.S. 307, 319, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979). We conclude that the evidence, though not overwhelming and largely circumstantial, was sufficient to support the verdict of the jury.

## II

The defendant also asserts various claims of error relating to his indictment by the grand jury. On January 2, 1980, a grand jury was summoned, pursuant to General Statutes § 54-45, "relative to the matter of Linda McLaughlin, deceased." After being charged by the court, *Higgins, J.,* the grand jury was provided with a "list of witnesses and an indictment in blank." This list included the names of the defendant, his mother and his father. The grand jury was instructed that it might call any witness it chose, and that each witness, after being sworn, should be advised that he would be required to answer all questions posed except those that would incriminate him. The defendant and his parents were subpoenaed to appear before the grand jury. At that time, the defendant and his parents moved to quash those subpoenas on the grounds that: (1) the state's attorney was without power to issue them; (2) the state trooper was without authority to serve them, resulting in a lack of in personam jurisdiction;

and (3) their rights under the fourth, fifth and fourteenth amendments to the United States constitution and article first, § 8, of the Connecticut constitution would be violated. The motion to quash was denied by the court. The grand jury returned a "true bill," indicting the defendant for murder.

Following his indictment, the defendant filed a motion to dismiss based on various claims, including those asserted in his earlier motion to quash. This motion was also denied by the court. The defendant claims error in the trial court's denial of his motions to quash and to dismiss that were based upon a number of infirmities in the grand jury procedure. Although the grand jury proceeding did not in all particulars follow our usual state practice, we find the defendant's claims to be without merit.

## A

The state's attorney issued subpoenas to the defendant and his parents, summoning them to testify before the grand jury. The subpoenas were served by state policeman Michael Stergio, who was then investigating the murder. The defendant contends that his indictment should be overturned because the state's attorney lacked the power to issue the subpoena and because the subpoena was improperly served. We disagree.

There is no doubt that from earliest times the state's attorney has had the obligation to "refer to the grand jury the witnesses to support the bill of indictment." *Lung's Case,* 1 Conn. 428 (1815). Typically, the state's attorney submits to the grand jury a list, suggesting possible witnesses. *State* v. *Menillo,* 159 Conn. 264, 273–74, 268 A.2d 667 (1970); 2 Swift, Digest p. 394. Witnesses who do not voluntarily come before the grand jury must be subpoenaed. Throughout our history, the state's attorney has summoned witnesses to testify before the grand jury. Nahum & Schatz, "The

Grand Jury In Connecticut," 5 Conn. B.J. 111 (1931). Although there is no specific statutory authority for this power, "the state's attorney . . . derives his authority from the common law." *State* v. *Haskins,* 188 Conn. 432, 473, 450 A.2d 828 (1982); *State* v. *Keena,* 64 Conn. 212, 215, 29 A. 470 (1894). In 1976, the power of the state's attorney was codified in General Statutes § 51-286a, providing that a state's attorney "may issue subpoenas for witnesses to be sworn before the court in criminal cases." The defendant urges this court to interpret narrowly this provision as an express grant of power, exclusive of all other subpoena authority, in order to invalidate his indictment. We do not agree with this interpretation.

General Statutes § 51-85 grants to any attorney-at-law admitted to practice within this state the status of commissioner of the Superior Court, and confers upon him broad power to issue subpoenas. Certainly, § 51-286a cannot be read to grant *less* authority to a state's attorney. Further, the limitation of the subpoena power in § 51-286a to "criminal cases" does not exclude grand jury proceedings. "The grand jury proceedings *interposed* between the state's attorney's accusation and the defendant's trial were a constitutionally mandated step in the process of bringing the accused to final adjudication." (Emphasis in original.) *State* v. *Curcio,* 191 Conn. 27, 33, 463 A.2d 566 (1983). Because a grand jury indictment is an integral part of a criminal case in a prosecution for a capital felony, the state's attorney had the requisite authority to issue subpoenas directing witnesses to appear before the grand jury.[1]

---

[1] Constitutional grand juries are no longer required in this state. See article seventeenth of the amendments to the Connecticut constitution of 1965, adopted in the November, 1982 general election. The grand jury system has been replaced with probable cause hearings. See generally *State* v. *Sanabria,* 192 Conn. 671, 474 A.2d 760 (1984).

Nor was the defendant illegally served with the subpoena. General Statutes § 52-143 provides that a subpoena shall be served by "an officer or indifferent person." In this case, the subpoenas were served by a state police trooper. General Statutes § 29-7 gives to a state policeman the same power with respect to criminal matters and law enforcement as is given to sheriffs, policemen or constables. See General Statutes § 52-50. He would certainly be an "officer" as contemplated by § 52-143. It is irrelevant that the state trooper who served the subpoenas also participated in the investigation of the murder of Linda McLaughlin.

B

The defendant also claims that the underlying indictment was invalid because his fifth amendment privilege against self-incrimination was violated, when, as a prospective defendant in the case under consideration by the grand jury, he was forced to testify before that body pursuant to subpoena. Essentially, the defendant claims that as the "target" of the grand jury, he became, in a sense, a defendant in a criminal trial, and thus could refuse to testify before the grand jury altogether. See *United States* v. *Pepe,* 367 F. Sup. 1365, 1368–69 (D. Conn. 1973). Whatever may be the rule in the state of New York,[2] the protection against self-incrimination provided by the fifth amendment does not prohibit the state's attorney from summoning a prospective defendant before the grand jury. "[T]arget witness status neither enlarges nor diminishes the constitutional protection against compelled self-incrimination . . . ." *United States* v. *Washington,* 431 U.S. 181, 189, 97 S. Ct. 1814, 52 L. Ed. 2d 238

[2] Under the constitution of the state of New York, testimony of a prospective defendant, subpoenaed by the grand jury, may not be used as the basis of a subsequent indictment. See *People* v. *Laino,* 10 N.Y.2d 161, 176 N.E.2d 571, 218 N.Y.S.2d 647 (1961); *People* v. *Steuding,* 6 N.Y.2d 214, 160 N.E.2d 468, 189 N.Y.S.2d 166 (1959).

(1977). This court does not equate the position of a "potential defendant" called before a grand jury to that of a defendant on trial. To accept that concept would "denude that ancient body of a substantial right of inquiry." *United States* v. *Winter,* 348 F.2d 204, 207 (2d Cir. 1965). Federal cases addressing this issue are virtually uniform in holding that the fifth amendment does not afford the defendant the protection he claims. *United States* v. *Mandujano,* 425 U.S. 564, 584 n.9, 96 S. Ct. 1768, 48 L. Ed. 2d 212 (1976); *United States* v. *Friedman,* 445 F.2d 1076, 1088 (9th Cir.), cert. denied sub nom. *Jacobs* v. *United States,* 404 U.S. 958, 92 S. Ct. 326, 30 L. Ed. 2d 275 (1971); *United States* v. *Wolfson,* 405 F.2d 779, 784–85 (2d Cir. 1968), cert. denied, 394 U.S. 946, 89 S. Ct. 1275, 22 L. Ed. 2d 479 (1969); *Kitchell* v. *United States,* 354 F.2d 715, 720 (1st Cir. 1966); *United States* v. *Winter,* supra; *United States* v. *Carvelli,* 340 F. Sup. 1295, 1299 (E.D.N.Y. 1972); contra *Jones* v. *United States,* 342 F.2d 863, 867–70 (D.C. Cir. 1964); see generally annot., 38 A.L.R.2d 225, and later case service. "The obligation to appear is no different for a person who may himself be the subject of the grand jury inquiry." *United States* v. *Dionisio,* 410 U.S. 1, 10 n.8, 93 S. Ct. 764, 35 L. Ed. 2d 67 (1973). The defendant was not entitled to refuse to testify before the grand jury merely because he might have been the target of its inquiry.

Despite the prevailing contrary federal authority, the defendant urges this court to draw a distinction between the common law grand jury, traditionally armed with broad investigatory power, and the constitutional grand jury, as formerly mandated by article first, § 8, of our state constitution for an offense punishable by death or life imprisonment. Although we recognize that this court is free to impose a higher standard under our constitution than that mandated by the federal constitution; *Horton* v. *Meskill,* 172 Conn. 615,

376 A.2d 359 (1977); we decline to do so in this case. Section 54-45 grants the grand jury power to inquire into any offense that is cognizable by the court, and the actions of the grand jury in this case did not exceed that grant. This court held in *State* v. *Kemp,* 126 Conn. 60, 66, 9 A.2d 63 (1939), that the examination of witnesses by a grand jury need not be preceded by naming the persons ultimately charged. The fact that the defendant was a suspect but was not arrested prior to the grand jury proceedings in no way invalidates the indictment. The use of a constitutional grand jury as provided in § 54-45 to make inquiry has not been eliminated merely because the legislature has also established, in General Statutes § 54-47, a procedure to appoint members of the judiciary as an investigative grand jury. The grand jury in this case was investigating a specific crime. The submission of a blank indictment by the state's attorney did not render its inquiry improper or prejudice the defendant.

In addition, the defendant claims that, because the proposed indictment given to the grand jury was "in blank," he was precluded from exercising his privilege as an accused to be present while the grand jury heard evidence. Such an indictment is not unprecedented in Connecticut practice; *State* v. *McAllister,* Superior Court, judicial district of Tolland, Docket No. 4301 (October 17, 1978); and has consistently been utilized throughout the long history of the grand jury. See *Blair* v. *United States,* 250 U.S. 273, 282, 39 S. Ct. 468, 63 L. Ed. 979 (1919); *Hale* v. *Henkel,* 201 U.S. 43, 65, 26 S. Ct. 370, 50 L. Ed. 652 (1906); *Lopez* v. *United States,* 217 F.2d 643 (5th Cir. 1954); *United States* v. *Neff,* 212 F.2d 297, 301 (3d Cir. 1954). Furthermore, although an accused in this state normally has been afforded the privilege of attending the grand jury proceedings and cross-examining witnesses; *State* v. *Menillo,* 159 Conn. 264, 273–74, 268 A.2d 667 (1970); *State* v. *Wolcott,* 21

Conn. 272, 279 (1851); *State v. Fasset,* 16 Conn. 457, 469 (1844); this court has held that he has no absolute right to be present. *State v. Avcollie,* 188 Conn. 626, 632, 453 A.2d 418 (1982), cert. denied, 461 U.S. 928, 103 S. Ct. 2088, 77 L. Ed. 2d 299 (1983); *State v. Hamlin,* 47 Conn. 95, 104–105 (1879). The practice of allowing the named party to attend the grand jury proceedings is grounded upon sound judicial discretion which can be exercised to exclude that party for good cause. *State v. Menillo,* supra, 273. Since the defendant would have had no absolute right to attend the grand jury inquiry even had he been named in the indictment, his exclusion in the present circumstances was not erroneous.

The defendant also claims that he should have been allowed to refuse to testify before the grand jury because he, through counsel, notified the state's attorney prior to the impaneling of the grand jury of his intention to invoke his fifth amendment privilege in response to any question. The fifth amendment privilege against self-incrimination does not, however, include the right to refuse to be sworn as a witness before a grand jury. *United States v. Wong,* 431 U.S. 174, 179 n.8, 97 S. Ct. 1823, 52 L. Ed. 2d 231 (1977); *United States v. Pappadio,* 346 F.2d 5, 8 (2d Cir. 1965); *United States v. Scully,* 225 F.2d 113, 115 (2d Cir. 1955); *United States v. Isaacs,* 347 F. Sup. 743, 759 (N.D. Ill. 1972); *United States v. Pilnick,* 267 F. Sup. 791, 798–99 (S.D.N.Y. 1967); *United States v. Gilboy,* 160 F. Sup. 442, 460–61 (M.D. Pa. 1958). Further, when a witness does take the stand and claims the privilege, no prejudice results that would vitiate his subsequent indictment. *United States v. Fortunato,* 402 F.2d 79, 82 (2d Cir. 1968), cert. denied, 394 U.S. 933, 89 S. Ct. 1205, 22 L. Ed. 2d 463 (1969); *United States v. Bell,* 351 F.2d 868, 874 (6th Cir. 1965); *United States v.*

*De Sapio,* 299 F. Sup. 436, 440 (S.D.N.Y. 1969); *United States* v. *Leighton,* 265 F. Sup. 27, 37 (S.D.N.Y. 1967).

### C

The defendant's remaining grand jury claims are frivolous. He claims that he was prejudiced by the witness list that included a short caption of each witness' probable testimony. The use of a list of witnesses is common in Connecticut grand jury procedure. *State* v. *Couture,* 194 Conn. 530, 557, 482 A.2d 300 (1984), cert. denied, 469 U.S. 1192, 105 S. Ct. 967, 83 L. Ed. 2d 971 (1985); *State* v. *Menillo,* supra, 273–74. The list here contained brief summaries such as: "[c]an testify as to background information . . . as well as recent events prior to the victim's death." We hold that such a description is not improper and was not harmful to the defendant.

The defendant also claims that the evidence presented to the grand jury was not sufficient to support its finding of probable cause. Such a claim cannot be made before this court because it must be supported by unauthorized use of the grand jury transcript. *State* v. *Couture,* supra, 554–55; *State* v. *Canady,* 187 Conn. 281, 287, 445 A.2d 887 (1982). "[A]n indictment, 'fair upon its face,' and returned by a 'properly constituted grand jury,' conclusively determines the existence of probable cause and requires issuance of an arrest warrant without further inquiry." *Gerstein* v. *Pugh,* 420 U.S. 103, 117 n.19, 95 S. Ct. 854, 43 L. Ed. 2d 54 (1975).

### III

The defendant next claims that his case should have been dismissed because of pretrial delays. This claim must be broken into two components, one focusing on the delay between the incident and the indictment and the other on the time between the indictment and the trial.

## A

Focusing on the delay of thirteen months between the discovery of the victim's body on November 18, 1978, and the convening of the grand jury that eventually indicted him on January 3, 1980, the defendant claims error in the trial court's denial of his January 11, 1980 motion to dismiss. The trial court, noting that the motion relied solely on the defendant's sixth amendment right to a speedy trial, denied the motion without giving the defendant an opportunity to present testimony concerning the reasons for the delay or any prejudice that might have resulted therefrom. After he was found guilty, the defendant included a due process challenge to the pretrial delay on his motion for a new trial.

On appeal, the defendant has recognized that "the Sixth Amendment speedy trial provision has no application until the putative defendant in some way becomes an 'accused,' an event that occurred in this case only when the [defendant was] indicted" on January 3, 1980. *United States* v. *Marion,* 404 U.S. 307, 313, 92 S. Ct. 455, 30 L. Ed. 2d 468 (1971); *State* v. *Carrione,* 188 Conn. 681, 693, 453 A.2d 1137 (1982), cert. denied, 460 U.S. 1084, 103 S. Ct. 1775, 76 L. Ed. 2d 347 (1983). Yet the defendant's pretrial motion alleged only that "he [had] been denied his right to a speedy trial guaranteed to him by the Sixth Amendment to the United States Constitution . . . ." The trial court, relying on Practice Book § 812, which requires that pretrial motions "include a statement of the factual and legal or other basis therefor," refused to allow the defendant at the time of argument to expand the legal basis for his motion beyond the speedy trial claim that is plainly inapposite. We agree with the trial court that it would have been unfair to require both the state and the court to guess that the basis for the defendant's

motion was something other than what it plainly appeared to be. The trial court did not err in denying the motion.

In his post-trial motion for a new trial, the defendant raised the due process argument that had not been properly raised earlier. While we do not approve of the issue being first raised in this manner; see Practice Book §§ 808, 811; the defendant is nevertheless entitled to review of his claim "because it involves 'a fundamental constitutional right.' *Klopfer* v. *North Carolina,* 386 U.S. 213, 223–26, 87 S. Ct. 988, 18 L. Ed. 2d 1 [1967]; see *State* v. *Evans,* 165 Conn. 61, 70, 327 A.2d 576 [1973]." *State* v. *L'Heureux,* 166 Conn. 312, 315, 348 A.2d 578 (1974).

The role of due process protections with respect to pre-accusation delay has been characterized as a "limited" one. *United States* v. *Lovasco,* 431 U.S. 783, 789, 97 S. Ct. 2044, 52 L. Ed. 2d 752 (1977). "[T]he Due Process Clause does not permit courts to abort criminal prosecutions simply because they disagree with a prosecutor's judgment as to when to seek an indictment. . . . Our task is more circumscribed. We are to determine only whether the action complained of . . . violates those 'fundamental conceptions of justice which lie at the base of our civil and political institutions,' *Mooney* v. *Holohan,* 294 U.S. 103, 112 [55 S. Ct. 340, 79 L. Ed. 791] (1935), and which define 'the community's sense of fair play and decency,' *Rochin* v. *California,* [342 U.S. 165, 173, 72 S. Ct. 205, 96 L. Ed. 2d 183 (1952)]." *United States* v. *Lovasco,* supra, 790. The due process clause has not replaced "the applicable statute of limitations . . . [as] . . . the primary guarantee against bringing overly stale criminal charges." *United States* v. *Marion,* supra, 322, quoting *United States* v. *Ewell,* 383 U.S. 116, 122, 86 S. Ct. 773, 15 L. Ed. 2d 627 (1966); see also *Toussie* v.

*United States,* 397 U.S. 112, 114–15, 90 S. Ct. 858, 25 L. Ed. 2d 156 (1970); *State* v. *Carrione,* supra, 693.[3]

In order to establish a due process violation because of pre-accusation delay, the defendant must show both that actual substantial prejudice resulted from the delay and that the reasons for the delay were wholly unjustifiable, as where the state seeks to gain a tactical advantage over the defendant. *State* v. *Carrione,* supra, 693–94; see also *Stoner* v. *Graddick,* 751 F.2d 1535, 1542 (11th Cir. 1985); *United States* v. *Puett,* 735 F.2d 1331, 1334 (11th Cir. 1984); *United States* v. *DiMuro,* 540 F.2d 503, 516 (1st Cir.), cert. denied, 429 U.S. 1038, 97 S. Ct. 733, 50 L. Ed. 2d 749 (1976). *"Marion* makes clear that proof of prejudice is generally a necessary but not sufficient element of a due process claim, and that the due process inquiry must consider the reasons for the delay as well as the prejudice to the accused." *United States* v. *Lovasco,* supra, 790. Despite the defendant's conclusory protestations to the contrary, we have found nothing in the record that would substantiate either of these requirements. There is a complete absence of proof concerning the cause or effect of the pretrial delay. Under these circumstances, we cannot conclude that the thirteen month period between the discovery of the crime and the indictment of the defendant violated his right to due process of law. Accord *State* v. *Gallagher,* 326 S.E.2d 873 (N.C. 1985) (five year delay; no showing); *State* v. *Stock,* 361 N.W.2d 280 (S.D. 1985) (three year delay; no showing).

## B

The defendant also claims that the delay of almost nineteen months between his indictment on January 3,

---

[3] At the time of the offense in 1978, General Statutes § 54-193 provided for no period of limitations for prosecuting violations of General Statutes § 53a-54a, of which this defendant was convicted. See *State* v. *Paradise,* 189 Conn. 346, 348, 456 A.2d 305 (1983).

1980, and the commencement of his trial on July 28, 1981, violated his constitutional right. This claim of postarrest delay does involve the sixth amendment right to a speedy trial. See *United States* v. *MacDonald,* 456 U.S. 1, 6, 102 S. Ct. 1497, 71 L. Ed. 2d 696 (1982). "The sixth amendment guarantee of a speedy trial is a fundamental right applicable to the states through the fourteenth amendment of the United States constitution. *Klopfer* v. *North Carolina,* 386 U.S. 213, 223, 87 S. Ct. 988, 18 L. Ed. 2d 1 (1967). This right is also guaranteed by the Connecticut constitution, article first, § 8. In *Barker* v. *Wingo,* 407 U.S. 514, 92 S. Ct. 2182, 33 L. Ed. 2d 101 (1972), the United States Supreme Court rejected rigid standards for determining the precise point in time after which the accused's right would be deemed denied, but instead adopted a balancing test to be applied on a case by case basis. Four factors form the matrix from which an analysis of this relative right develops: 'Length of delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant.' Id., 530; *State* v. *McCarthy,* 179 Conn. 1, 5, 425 A.2d 924 (1979). As both of these cases indicate, none of these factors standing alone would demand a set disposition; rather it is the total mix which determines whether the defendant's right was violated." *State* v. *Nims,* 180 Conn. 589, 591–92, 430 A.2d 1306 (1980); see also *State* v. *Davis,* 192 Conn. 739, 740–41, 474 A.2d 776 (1984); *State* v. *Johnson,* 190 Conn. 541, 544–45, 461 A.2d 981 (1983).

In several cases, we have determined that delays of similar length to that involved here are sufficient to trigger inquiry into the remaining factors set forth in *Barker* v. *Wingo,* supra. See *State* v. *Johnson,* supra, 545 (sixteen months); *State* v. *Nims,* supra, 592 (sixteen months); *State* v. *McCarthy,* supra, 6–7 (nineteen months). Nevertheless, there is "no constitutional basis for holding that the speedy trial right can be quanti-

fied into a specified number of days or months." *Barker* v. *Wingo,* supra, 523. "We regard none of the four factors identified above as either a necessary or sufficient condition to the finding of a deprivation of the right of speedy trial." Id., 533.

The record is barren of any findings as to the cause of the delay between indictment and trial. In his brief the defendant makes allegations, unsupported by any transcript citations, that the delay was caused in part by court congestion and in part by the state's "tactical decision to turn discovery into a war." While we may take judicial notice of the large caseload confronting the courts of this state; see *Gaines* v. *Manson,* 194 Conn. 510, 481 A.2d 1084 (1984); *Pellegrino* v. *O'Neill,* 193 Conn. 670, 480 A.2d 476 (1984), cert. denied, 469 U.S. 875, 105 S. Ct. 236, 83 L. Ed. 2d 176 (1984); we cannot, without more specific information concerning the status of the criminal docket in the Middlesex judicial district, where this case was pending, assume that this condition caused any substantial delay in the case. See *Moore* v. *Moore,* 173 Conn. 120, 123, 376 A.2d 1085 (1977). Nor can the state's nonfrivolous resistance to disclosure of certain evidence, reciprocated in kind by the defendant's objections to disclosure requests made by the state, which could only be resolved by lengthy court proceedings, be held to be unjustifiable reasons for the resulting delay. Whatever portion of the delay may have been attributable to the extensive discovery proceedings and the time reasonably required to comply with resulting discovery orders is excusable, but no calculation of the time thus consumed has been presented by either party. "[J]ustice is supposed to be swift but deliberate." *Barker* v. *Wingo,* supra, 521. There is no requirement that the state eschew those protections designed to ensure the fairness of a trial in pursuing its responsibilty to bring a case to trial more speedily. Justice accelerated without regard to its qual-

ity, like justice delayed, is often not justice at all. *United States* v. *Ewell,* supra, 120; *State* v. *Troynack,* 174 Conn. 89, 91, 384 A.2d 326 (1977). While we recognize that not all of the delay complained of by the defendant may have been caused by this extensive and time consuming discovery process, the circumstance that some of the delay that occurred in this case was justifiable, in the absence of any effort by the defendant to quantify separately any unjustifiable delay, makes it extremely difficult for us to conclude on review that impermissible reasons contributed substantially to the delay challenged by the defendant. Thus the reason for delay factor cannot be said to weigh entirely in the defendant's favor.

The defendant has been fairly energetic, but not altogether consistent, in asserting his right to a speedy trial. After initially agreeing to await delivery of the grand jury transcript before scheduling argument on his pretrial motions, the defendant, one month later, attempted to use the delay in providing the transcript as a reason to reduce his bond pending trial.[4] On March 28, 1980, the defendant moved to dismiss the charges against him because of the failure of the state to provide the transcript or to schedule a hearing on his motion for reduction of bond.[5] On July 10, 1980, and again on October 9, 1980, the defendant moved to dismiss on the basis of the denial of his right to a speedy trial. On March 12, 1981, the defendant again moved to dismiss because of the failure to provide a speedy trial, but he withdrew this motion a week later. Finally,

---

[4] In *Cain* v. *Smith,* 686 F.2d 374, 384 (6th Cir. 1982), the court held that "a demand for reasonable bail is the functional equivalent of a demand for a speedy trial."

[5] This complaint also formed the basis for a habeas corpus petition submitted to the federal district court by the defendant on July 8, 1980. This petition was later withdrawn on July 25, 1980, after the Superior Court heard argument on several pending motions, including that for a reduction in bond, which was granted.

on May 8, 1981, the defendant moved for an immediate trial, but later in argument he acquiesced to the state's suggestion that the trial begin on July 20, 1981. The trial actually started one week later, on July 28, 1981. The denial of his speedy trial right was also included in the defendant's motion for a new trial. While the defendant has frequently asserted his right, we do not consider this factor to provide overwhelming support for the dismissal of this case. The defendant's decision to withdraw his last motion to dismiss and his acquiescence in a further reasonable delay when his motion for an immediate trial was heard indicate an attempt to prod the state into an early trial rather than a persistent contention that the reasons for the delay were wholly inexcusable. Thus the defendant's assertion of his right weighs in his favor, but not nearly to the degree demonstrated in *State* v. *Lloyd,* 185 Conn. 199, 209, 440 A.2d 867 (1981), where we found the defendant's diligence in asserting his right to have been "exemplary," but still "insufficient to warrant dismissal."

As we stated in *State* v. *Lloyd,* supra, "the linchpin of the speedy trial claim is a showing of prejudice," the fourth factor listed in *Barker* v. *Wingo,* supra, 530. While it is possible that the other factors together might make a showing of prejudice unnecessary in any given case; *Moore* v. *Arizona,* 414 U.S. 25, 26, 94 S. Ct. 188, 38 L. Ed. 2d 183 (1973); we do not find that situation here. Nor where such a showing is needed will it be presumed. "[U]nlike the right to counsel or the right to be free from compelled self-incrimination, deprivation of the right to speedy trial does not *per se* prejudice the accused's ability to defend himself." *Barker* v. *Wingo,* supra, 521. Three interests have been identified as those which the right to speedy trial was designed to protect and which therefore may be prejudiced by the deprivation of that right.

They are: "(i) to prevent oppressive pretrial incarceration; (ii) to minimize anxiety and concern of the accused; and (iii) to limit the possibility that the defense will be impaired." Id., 532; *State* v. *McCarthy,* supra, 9. In this case, the defendant claims that he was prejudiced by his pretrial incarceration and his inability to locate possible suspects due to the passage of time.

The defendant was incarcerated for eight months after his arrest on January 4, 1980, and then was released on bond for the remaining eleven months before trial. The defendant makes no claim that even had this case proceeded with all possible dispatch the trial would have commenced within eight months of his arrest. The collection and analysis of evidence, mostly circumstantial, and the logistics involved in putting together the state's case, together with the substantial discovery and other pretrial motions practice engaged in by both parties, may very well have taken this much time even if pursued with all deliberate speed. Thus his eight months of pretrial incarceration lacks a sufficient nexus to the alleged deprivation of the defendant's speedy trial right to support a claim of prejudice.

In *Barker* v. *Wingo,* supra, 532, the court noted that of the three interests served by the right to speedy trial, "the most serious is the last, because the inability of a defendant adequately to prepare his case skews the fairness of the entire system. If witnesses die or disappear during a delay, the prejudice is obvious. There is also prejudice if defense witnesses are unable to recall accurately events of the distant past." The defendant claims to have been prejudiced by his inability to locate a certain drug supplier whom the victim feared, according to several witnesses, and by the general weakening of his witnesses' memories. This latter claim, relying on the simple passage of time, cannot, without a more specific showing, be said to prejudice the defend-

ant any more than the state. "As the time between the commission of the crime and trial lengthens, witnesses may become unavailable or their memories may fade. If the witnesses support the prosecution, its case will be weakened, sometimes seriously so. And it is the prosecution which carries the burden of proof." *Barker* v. *Wingo,* supra, 521.

Nor do we consider the alleged difficulty in finding the missing drug dealer or witnesses familiar with his activity a sufficient showing of prejudice. " '[I]f a defendant merely alleges . . . inabilty to locate known or unknown witnesses who might testify on his behalf, he has failed to illustrate prejudice with the required degree of specificity. *United States* v. *Ewell,* 383 U.S. 116, 122, 86 S. Ct. 773, 15 L. Ed. 2d 627 [1966]; *United States* v. *Churchill,* 483 F.2d 268, 273–74 (lst Cir. [1973]).' *State* v. *L'Heureux,* 166 Conn. 312, 321, 348 A.2d 578 (1974)." *State* v. *Johnson,* supra, 546; accord *State* v. *Davis,* 192 Conn. 739, 746, 474 A.2d 776 (1984). The defendant must establish that the witnesses would have been available without the delay. See *State* v. *Johnson,* supra, 546; *State* v. *Troynack,* supra, 94. Conjectural claims of prejudice from a delay are not persuasive. *State* v. *Johnson,* supra, 546; see also *State* v. *Lasher,* 190 Conn. 259, 266, 460 A.2d 970 (1983).

The defendant in this case has not attempted to explain how the delay between his arrest and his trial affected his investigator's efforts to find the drug dealer or those who might be able to help him do so. This is not a case where a witness died or became unavailable or had a failure of memory. See *Barker* v. *Wingo,* supra, 532. Except for a description of a vehicle reportedly used by the drug dealer, which was disclosed at trial,[6] the defendant was given all of the information collected by the state pertaining to this individual on April 28,

---

[6] See footnote 14, infra.

1980, about four months after he was indicted. If the defendant could not find these witnesses soon after this time, there is little reason to believe that the further delay before trial harmed him rather than gave him extra time within which to continue searching. This claim of prejudice, without any explanation as to how the inability to produce evidence related to the delay complained of, is of the conjectural kind that is insufficient to support a claimed deprivation of the right to a speedy trial.

Balancing these factors together, we conclude that the absence of any proof of prejudice or improper cause for the delay outweighs the defendant's adequate assertion of his right and threshold showing concerning the length of the delay between arrest and trial. Therefore, we conclude that there has been no deprivation of the defendant's constitutional right to a speedy trial.

## IV

The defendant also contends that certain testimony concerning his failure to respond to questions asked of him by police officers prior to trial while he was in custody on another charge should not have been admitted. We agree with the defendant that the trial court erred in allowing the testimony.

The facts underlying this claim are essentially undisputed. On January 3, 1979, state trooper Michael Stergio received information from a police dispatcher that the defendant wanted to speak with him. The trooper had earlier spoken with the defendant's parents concerning the death of Linda McLaughlin.[7] Trooper Stergio and another officer, Max Pabilonia, proceeded to the Hartford jail, where the defendant was being held on a parole violation. The troopers immediately advised the defendant of his *Miranda*

---

[7] The record does not establish whether the defendant was present during this conversation.

rights, including his right to have an attorney present.[8] The defendant nevertheless indicated that he wished to deal directly with the officers, despite the fact that he was represented by counsel at that time. The defendant said that he did not trust his lawyer and would not speak if his lawyer was present. The defendant stated that he had contacted Stergio in order to make a deal to exchange certain information he had concerning Linda McLaughlin's death for a transfer of his confinement from the Hartford jail to Norwich state hospital for the remainder of his parole violation term.

While the officers awaited the decision of the state's attorney assigned to the case whether to accept the deal proposed by the defendant, they continued to converse with him. In addition to reiterating his constitutional rights, the officers elicited from the defendant that he had a high school education, that his physical condition was good but that he did not feel qualified to assess his mental condition, and that he had taken four "hits" of LSD, an hallucinogen, the previous afternoon. In response to several questions concerning the nature of his information, the defendant's answer was essentially "no deal, no information." It was under these circumstances that Stergio then asked the defendant whether he had killed Linda McLaughlin. The trial court admitted, over objection, Stergio's testimony that the defendant, whose head was lowered when the question was asked, did not respond. Stergio repeated the

---

[8] In *Miranda* v. *Arizona,* 384 U.S. 436, 479, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), the court held that when a suspect is subjected to custodial interrogation, "[h]e must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires." Trooper Stergio testified that the defendant in this case was advised of these rights "several times," and was further told that the police "were aware of the fact that Attorney James Wade had been involved somewhat in the proceedings so far, and that before he spoke to us, he should advise Mr. Wade that he wanted to talk to us."

question and again the defendant did not raise his head or otherwise respond to the question. After Stergio asked the defendant for the third time whether he had killed the victim, the defendant sarcastically answered, "No, is that what you want to hear?" After the state's attorney decided that no deal could be made, the defendant again repeated that he would give no information without receiving something in return. The trial court later gave a consciousness of guilt instruction that could be understood to relate to the defendant's initial failure to deny his complicity in the death of Linda McLaughlin.[9]

The defendant claims that the trial court erred in admitting testimony concerning this conversation (1) because the entire interview, conducted after the defendant had secured counsel, violated his sixth amendment right to counsel, (2) because the state failed to show an effective waiver of *Miranda* rights, and (3) because admission of the defendant's nonresponses violated his due process rights and was not consistent with evidentiary standards for the interpretation of a defendant's conduct as an admission.

A

The defendant's right to counsel claim based on the sixth amendment requires little discussion. "We have consistently held that a defendant's right to counsel under the sixth amendment or its state constitutional counterpart arises only ' "at or after the initiation of

[9] After giving a general instruction upon the law concerning consciousness of guilt, the trial court charged the jury as follows: "Now, the state claims that certain statements were made by the defendant and certain conduct carried out by the defendant constitutes consciousness of guilt. It is up to you as judges of the facts to decide whether or not certain statements or conduct of the defendant reflect consciousness of guilt and to consider such in your deliberations as in the conformity with the law." We are not aware of any statement of the defendant to which this instruction may have related other than that which occurred when the defendant did not answer trooper Stergio's questions at the Hartford jail.

adversary judicial criminal proceedings—whether by way of formal charge, preliminary hearing, indictment, information or arraignment." *Kirby* v. *Illinois,* 406 U.S. 682, 689, 92 S. Ct. 1877, 32 L. Ed. 2d 411 (1972).' *State* v. *Vitale,* 190 Conn. 219, 232, 460 A.2d 961 (1983)." *State* v. *Falcon,* 196 Conn. 557, 560, 494 A.2d 1190 (1985). The circumstance that the defendant was represented by counsel on a related matter has no effect on the time when his right to counsel attached as to the murder charge, concerning which adversarial proceedings were not initiated until long after this conversation. While *Massiah* v. *United States,* 377 U.S. 201, 84 S. Ct. 1199, 12 L. Ed. 2d 246 (1964), holds that the absence of counsel at critical post-indictment stages requires the suppression of evidence relating to the charged crime gathered at such times, *"Massiah* offers no basis for the exclusion of testimony relating to uncounseled, post-indictment statements that involved criminal acts or constituted criminal acts in themselves. Such statements, even though elicited by government agents after indictment and in the absence of counsel, may form the basis for a separate or superseding indictment and may be offered to prove such additional charges." *State* v. *Biller,* 190 Conn. 594, 615, 462 A.2d 987 (1983); *United States* v. *Grego,* 724 F.2d 701, 703 (8th Cir. 1984); *United States* v. *DeWolf,* 696 F.2d 1, 3 (1st Cir. 1982); *United States* v. *Moschiano,* 695 F.2d 236, 241 (7th Cir. 1982). The sixth amendment does not require that we adopt a more restrictive rule similar to that followed in New York; see *People* v. *Bartolomeo,* 53 N.Y.2d 225, 229, 423 N.E.2d 371, 440 N.Y.S.2d 894 (1981);[10] nor are we otherwise inclined to do so. Thus, the fact that the conversation at the Hartford jail was

---

[10] In *People* v. *Bartolomeo,* 53 N.Y.2d 225, 229, 423 N.E.2d 371, 440 N.Y.S.2d 894 (1981), the New York Court of Appeals held: "Where to the knowledge of the interrogating officer a suspect being questioned has been arrested by the same law enforcement agency nine days previously on an unrelated charge, statements obtained in consequence of the interrogation

held in the absence of the attorney representing the defendant in an unrelated criminal matter, who was also acting as his attorney in this case, prior to a formal criminal charge, did not infringe the defendant's sixth amendment right to counsel.

## B

The defendant also claims that there was insufficient evidence to support a finding that he waived his rights under *Miranda* v. *Arizona,* 384 U.S. 436, 478–79, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), before he spoke with the police at the Hartford jail. " 'The courts must presume that a defendant did not waive his rights; the prosecution's burden is great . . . .' [*North Carolina* v. *Butler,* 441 U.S. 369, 373, 99 S. Ct. 1755, 60 L. Ed. 2d 286 (1979).] Where, as in this case, 'the record discloses no verbal utterance by the defendant that he wanted either to rely on his rights or to waive them,' this court has held that 'before a conclusion of waiver can be supported, the state must demonstrate: (1) that the defendant *understood* his rights, and (2) that the defendant's *course of conduct* indicated that he did, in fact, waive those rights. *North Carolina* v. *Butler,* supra, 373.' (Emphasis in original.) *State* v. *Wilson,* 183 Conn. 280, 284–85, 439 A.2d 330 (1981); see *State* v. *Harris,* 188 Conn. 574, 579–80, 452 A.2d 634 (1982)." *State* v. *Williams,* 190 Conn. 104, 112, 459 A.2d 510 (1983).

As to whether the defendant understood his rights, the state presented trooper Stergio's testimony that he "several times" warned the defendant of his *Miranda* rights, that the defendant indicated that he understood his rights, and that he seemed healthy, alert

must be suppressed if in fact the suspect is represented by an attorney with respect to the unrelated charge even though the fact of such representation is unknown to the officer. In such circumstances [the] defendant cannot effectively waive his right to counsel unless the attorney is present."

and responsive to the officer's questions. The defendant also conceded that he had an extensive criminal record, and that he had heard the *Miranda* recital in the past and understood it. In countering this evidence, the defendant points to the fact that he had taken an hallucinogenic drug the day before this interview and that he had told the officers that he did not feel competent to assess his mental condition. Our close examination of the record, including the defendant's testimony, in the absence of the jury, in which he exhibited a clear and independent recollection of the events in question, leads us to conclude that the trial court did not err in ruling that the defendant understood his rights.

The defendant's reliance on his refusal to sign a waiver form goes to the second relevant inquiry, whether his conduct indicated a waiver. "A refusal to sign a waiver form is a relevant factor in determining whether an individual knowingly, intelligently, and voluntarily waived his privilege, but it is not a controlling one. *United States* v. *Cruz,* 603 F.2d 673, 675 (7th Cir. 1979), citing *North Carolina* v. *Butler,* 441 U.S. 369, 99 S. Ct. 1755, 60 L. Ed. 2d 286 (1979)." *State* v. *Derrico,* 181 Conn. 151, 165, 434 A.2d 356, cert. denied, 449 U.S. 1064, 101 S. Ct. 789, 66 L. Ed. 2d 607 (1980). Under the circumstances of this case, despite the failure to sign a written waiver, the conduct of the defendant clearly indicated that he wished to waive his *Miranda* rights for the limited purpose of attempting to make a deal with the state. The defendant initiated the interview and defined its scope and the officers merely responded to his actions. The conversation at the Hartford jail did not fall afoul of the right protected in *Miranda* v. *Arizona,* supra, in this respect.

C

While it is clear that the conversation at the jail, to the extent it related to the deal proposed by the defend-

ant, did not violate *Miranda,* we cannot condone the state's attempt to introduce evidence of portions of that conversation that included claimed admissions of the defendant by conduct in response to questions which the defendant did not answer expressly. The defendant's objection to that portion of the encounter in which he failed to respond when asked if he had murdered the victim should have been sustained.

Generally, "statements made within the accused's 'hearing, which are relevant and material, to which he makes no reply, may be given in evidence as indicative of conduct on his part, when the circumstances show that he heard, understood and comprehended the statement, and the facts are known to him and he had the opportunity to speak and the circumstances naturally called for a reply from him.' " *State* v. *Harris,* 182 Conn. 220, 228, 438 A.2d 38 (1980), quoting *State* v. *Ferrone,* 97 Conn. 258, 265–66, 116 A. 336 (1922). "Where, however, the accused is in custody, 'our law accords him the right to reply to question or statement, or to remain silent. His silence under such circumstances cannot be laid in evidence against him.' *State* v. *Ferrone,* [supra, 266]; 3 Wharton, [Criminal Evidence (13th Ed.)] § 703." *State* v. *Cook,* 174 Conn. 73, 76, 381 A.2d 563 (1977). This rule, which we adopted in *State* v. *Ferrone,* supra, 266, over sixty years ago, has been more recently explained by the United States Supreme Court as a necessary consequence of *Miranda.* "Silence in the wake of these warnings may be nothing more than the arrestee's exercise of these *Miranda* rights. Thus, every post-arrest silence is insolubly ambiguous because of what the State is required to advise the person arrested. See *United States* v. *Hale,* [422 U.S. 171, 177, 95 S. Ct. 2133, 45 L. Ed. 2d 99 (1975)]. Moreover, while it is true that the *Miranda* warnings contain no express assurance that silence will carry no penalty, such assurance is implicit to any person who receives

the warnings. In such circumstances, it would be fundamentally unfair and a deprivation of due process to allow the arrested person's silence to be used to impeach an explanation subsequently offered at trial." *Doyle* v. *Ohio,* 426 U.S. 610, 617–18, 96 S. Ct. 2240, 49 L. Ed. 2d 91 (1976).[11]

In its brief, the state has attempted to separate the two aspects of the rule clarified in *Doyle,* claiming that because the defendant made no constitutional argument before the trial court, but only a relevance argument, we should not consider the due process portion of the reasoning in *Doyle.* We have already held, however, that *Doyle* violations, which are "fundamentally unfair and a deprivation of due process," are properly reviewable under *State* v. *Evans,* 165 Conn. 61, 327 A.2d 576 (1973), despite the failure to raise them in the trial court. *State* v. *Zeko,* 177 Conn. 545, 553, 418 A.2d 917 (1979); *State* v. *Moye,* 177 Conn. 487, 495–96, 418 A.2d 870, vacated on other grounds, 444 U.S. 893, 100 S. Ct. 199, 62 L. Ed. 2d 129, on remand, 179 Conn. 761, 409 A.2d 149 (1979).

Nor can the state avoid the application of the due process rationale of *Doyle* by characterizing the defendant's conduct as something other than silence. Obviously a response, whether verbal or nonverbal, is not silence, the admission of which is precluded by *Doyle. Anderson* v. *Charles,* 447 U.S. 404, 100 S. Ct. 2180, 65 L. Ed. 2d 222, reh. denied, 448 U.S. 912, 101 S. Ct. 27, 65 L. Ed. 2d 1173 (1980); *State* v. *Reid,* 193

---

[11] As we noted in *State* v. *Green,* 194 Conn. 258, 270, 480 A.2d 526 (1984), cert. denied, 469 U.S. 1191, 105 S. Ct. 964, 83 L. Ed. 2d 969 (1985), "[w]hile the circumstances of this case disclose that there was no impeachment of the defendant personally as a witness, we, nevertheless, deem the *Doyle* analysis helpful because of the alleged 'impeachment' of the defendant by the state in its case-in-chief. See *Chapman* v. *United States,* 547 F.2d 1240, 1248 (5th Cir.), cert. denied, 431 U.S. 908, 97 S. Ct. 1705, 52 L. Ed. 2d 393 (1977)." See also *State* v. *Zeko,* 177 Conn. 545, 554, 418 A.2d 917 (1979).

Conn. 646, 653, 480 A.2d 463 (1984).[12] Here the state has introduced only some doubt as to the interpretation of the defendant's conduct. This showing will not support its admissibility as a response to the inquiry in the context of a custodial interrogation. "Where hearsay accusations are sought to be introduced as evidence against a defendant in a criminal proceeding on grounds that the hearsay was 'adopted' by defendant as an admission of his guilt, the trial court must first determine that the asserted adoptive admission be manifested by conduct or statements which are *unequivocal, positive, and definite* in nature, *clearly showing* that in fact defendant intended to adopt the hearsay statements as his own." (Emphasis in original.) *State Village of New Hope* v. *Duplessie,* 304 Minn. 417, 425, 231 N.W.2d 548 (1975). "Similarly, when an equivocal response is given, the statement is not admissible if the accused does not *unambiguously assent* to the statement, *United States* v. *Coppola,* 526 F.2d 764 (10th Cir. 1975), or the response represents a desire not to communicate incriminating information. See generally McCormick on Evidence § 161 (2d Ed. 1972); cf. *United States* v. *Johnson,* 558 F.2d 1225 (5th Cir. 1977) (ban on evidence of post-arrest silence includes ambiguous expression of desire to remain silent); *State* v. *McCaughey,* 14 Wash. App. 326, 541 P.2d 998 (1975) (accused nodded head in apparent agreement, state-

---

[12] This case differs from the circumstances presented in our recent decision in *State* v. *Talton,* 197 Conn. 280, 497 A.2d 35 (1985), where the express refusal of the defendant to disclose the name of a person to whom he had referred as a possible alibi witness was held to be admissible after the defendant had unconditionally waived his right to remain silent at the start of the interrogation and freely answered all the other questions asked of him. We concluded that such a selective refusal to disclose was not an invocation of the right to remain silent and did not constitute the ambiguous silence that the *Miranda* warnings might conceivably have induced. See *Doyle* v. *Ohio,* 426 U.S. 610, 617–18, 96 S. Ct. 2240, 49 L. Ed. 2d 91 (1976). In the present case the defendant's silence was not "selective" but total in the sense that he never answered any questions relating to the commission of the crime.

ment admissible)." (Emphasis added.) *Harrison* v. *State*, 608 P.2d 1107, 1109 (Nev. 1980); see also *State* v. *Fingert*, 298 N.W.2d 249, 251–52 (Iowa 1980); annot., 87 A.L.R.3d 706 § 20.

Moreover, the circumstances in which the inquiry concerning the death of Linda McLaughlin took place were not such as to have "naturally called for a reply from [the defendant]"; *State* v. *Ferrone*, supra, 266; and thus compound the insoluble ambiguity relied upon as the first ground for excluding the testimony in *Doyle*. In this situation, where the defendant declared that he was holding back information concerning the murder in order to obtain a "deal," his ambiguous failure to answer questions concerning the murder cannot be attributed more to his own guilt than to his desire not to disclose his cards until the agreement he sought for a transfer to Norwich had been struck. See generally *State* v. *Vitale*, 197 Conn. 396, 497 A.2d 956 (1985). Trooper Stergio testified that the defendant had stated that he would say nothing unless he were to benefit thereby.

The testimony concerning the defendant's refusal to answer questions specifically implicating him in the crime was in effect an impermissible comment upon the defendant's exercise of his rights under the fifth amendment to remain silent and not to incriminate himself. The testimony was not necessary to explain the context of other statements; *State* v. *Green*, 194 Conn. 258, 270, 480 A.2d 526 (1984), cert. denied, 469 U.S. 1191, 105 S. Ct. 964, 83 L. Ed. 2d 969 (1985); nor to rebut an unfounded inference that its absence might inspire. *State* v. *Talton*, 197 Conn. 280, 497 A.2d 35 (1985). The trial court therefore erred in admitting this evidence concerning the defendant's nonresponse to Stergio's accusatory inquiries.

The state would have us uphold the defendant's conviction nevertheless by finding any error in the admission of this testimony to have been harmless. We have previously noted that " 'comment upon the silence of the accused as a prosecutorial technique is often a crooked knife, and one likely to turn in the prosecutor's hand. The infusion of "harmlessness" into error must be the exception, applicable in circumstances few and discrete, and to be sparingly employed.' *State* v. *Zeko,* 177 Conn. 545, 558, 418 A.2d 917 (1979)." *State* v. *Pellegrino,* 194 Conn. 279, 293, 480 A.2d 537 (1984). The evidence in this case was largely circumstantial, involving a delicate exercise of the factfinding function of the jury. We cannot say, as we must in order to hold harmless an error of constitutional magnitude; *State* v. *Truppi,* 182 Conn. 449, 465, 438 A.2d 712 (1980), cert. denied, 451 U.S. 941, 101 S. Ct. 2024, 68 L. Ed. 2d 329 (1981); that it is "clear beyond a reasonable doubt that the jury would have returned a verdict of guilty" absent this impermissible testimony; *United States* v. *Hasting,* 461 U.S. 499, 511, 103 S. Ct. 1974, 76 L. Ed. 2d 96 (1983); and we therefore conclude that the error in admitting it requires that the defendant be granted a new trial.

## V

The trial court denied the defendant's motion to suppress the evidence seized as a result of a search, made pursuant to a warrant, of two automobiles owned by his mother and of the family home owned by his father, where the defendant resided. The trial court denied the motion for lack of standing on the part of the defendant and also concluded that the search was conducted under a valid warrant issued upon probable cause.

## A

Before us the defendant focuses upon the search and seizure of one of the vehicles, a 1976 Mercury Cougar

automobile found by the trial court to belong to the defendant's mother.[13] At the hearing on the motion to suppress, no evidence was presented, apparently because the warrant was being attacked only on its face. The state, however, did raise the issue of standing: "whether [the defendant] has a legitimate expectation of privacy in the invaded place . . . a motor vehicle registered to his mother, *de facto* his father's . . . ."

"Fourth amendment rights are personal rights which, like some other constitutional rights, may not be vicariously asserted." *Alderman* v. *United States,* 394 U.S. 165, 174, 89 S. Ct. 961, 22 L. Ed. 2d 176, reh. denied sub nom. *Ivanov* v. *United States,* 394 U.S. 939, 89 S. Ct. 1177, 22 L. Ed. 2d 475 (1969); see *Rakas* v. *Illinois,* 439 U.S. 128, 133, 99 S. Ct. 421, 58 L. Ed. 2d 387 (1978), reh. denied, 439 U.S. 1122, 99 S. Ct. 1035, 59 L. Ed. 2d 83 (1979). The defendant cannot raise the violation of his mother's rights that may have occurred if the search of the car was illegal in order to suppress evidence used solely against him. The fact that he may have been the target of the search did not automatically transform a possible violation of the rights of one having a legitimate possessory interest in the automobile into a possible violation of the defendant's own constitutional rights. "Standing does not exist even though the accused is the target of the search . . . ." *State* v. *Altrui,* 188 Conn. 161, 179, 448 A.2d 837 (1982); cf. *State* v. *Darwin,* 161 Conn. 413, 419–20, 288 A.2d 422 (1971). In *Rakas* v. *Illinois,* supra, prior concepts of standing to contest an illegal search were abandoned "in favor of an inquiry that focused directly on the sub-

---

[13] The motion to suppress filed by the defendant on January 11, 1980, refers only to "the results of a search and seizure of evidence at the home whereat he resides." At the hearing, however, the only search mentioned was that of the 1976 Mercury Cougar. The defendant claimed the car was owned by his father, but conceded that it was registered in his mother's name.

stance of the defendant's claim that he or she possessed a 'legitimate expectation of privacy' in the area searched." *Rawlings* v. *Kentucky,* 448 U.S. 98, 104, 100 S. Ct. 2556, 65 L. Ed. 2d 633 (1980).

The defendant claims that his prior use of the car as well as his possession of it "during the time in question" gave him a legitimate expectation of privacy in the car. The affidavit in support of the search warrant application refers to a statement by the defendant's mother that he had access to two cars registered in her name, the 1976 Mercury Cougar that was the subject of the suppression hearing and a green 1977 Mercury station wagon. It also contains information that the victim "was last seen at home on November 16, 1978 at 4 PM as she was leaving with Todd Morrill . . . and the two of them were in Morrills (sic) car, a silver colored Mercury Cougar." The affidavit includes additional statements indicating use of an unidentified vehicle by the defendant at about the time of the victim's disappearance: (1) that the defendant said "he had been with Linda McLaughlin on November 17, 1978 and had dropped her off at the Dairy Queen restaurant in Portland, Ct. early in the day"; and (2) that the defendant's mother "further told Trooper Stergio that her son, Todd Morrill, returned home at approximately 7:30 PM on November 17, 1978 and immediately went to bed." No additional information concerning the defendant's use of the 1976 Mercury was provided at the hearing on the motion to suppress. It is not claimed that he was in possession of the car at the time of the search.

"A person does not have a reasonable expectation of privacy . . . with regard to a car he has permission to use but is not using at the time of the search . . . ." *United States* v. *Smith,* 340 F. Sup. 1023, 1030 (D. Conn. 1972). The lesser expectation of privacy in a vehicle as compared to a residence has frequently

been noted. *Rakas* v. *Illinois,* supra, 148; *United States* v. *Chadwick,* 433 U.S. 1, 12, 97 S. Ct. 2476, 53 L. Ed. 2d 538 (1977); *Cardwell* v. *Lewis,* 417 U.S. 583, 590, 94 S. Ct. 2464, 41 L. Ed. 2d 325 (1974); *Almeida-Sanchez* v. *United States,* 413 U.S. 266, 279, 93 S. Ct. 2535, 37 L. Ed. 2d 596 (1973). The trial court properly concluded on the basis of the presentation at the suppression hearing that the defendant had failed to sustain his burden of demonstrating a legitimate expectation of privacy, the necessary predicate to his claim of a violation of his fourth amendment rights.

B

Although our conclusion that the defendant failed to show any intrusion upon his own right of privacy by virtue of the search of his mother's automobile is dispositive of his claim of error in the denial of his motion to suppress, to avoid problems that may arise upon the retrial we have ordered should the defendant attempt to renew his motion and introduce evidence of standing, we also consider his claim of an illegal search upon its merits. We agree with the trial court that the affidavit supporting the search warrant application sufficiently established probable cause for issuance of the warrant. The affidavit indicated that the body of Linda McLaughlin had been found on November 18, 1978, at 2 p.m. in the Wongunk Meadows in Portland, and that she had been stabbed and slashed, causing her death. The defendant, who had a criminal record including an arrest for assault and had been recently "dating" the victim, was the last person known to have seen her alive and said that he had "dropped her off" at the Dairy Queen in Portland early in the morning of November 17, 1978. From an examination of the area where the body was found, it appeared that the victim had been slain elsewhere and that her body had been transported by a motor vehicle to the remote area where it was discovered. It may be inferred from the affida-

vit that the defendant had used one of his mother's two cars described therein when the victim was last in his company. It was not unreasonable for the court to conclude from these circumstances that there was probable cause to believe that evidence pertaining to the crime would be found by a search of the vehicles.

The defendant attacks principally one paragraph of the affidavit in which the affiants report they were told by John Larson, the resident state trooper in Portland, that he knew the defendant, who "frequents the area where the body of Linda McLaughlin was found and that at the present time, November 19, 1978 at 0100 AM, Morrill cannot be found." At the trial, Larson testified that: (1) he did not know the defendant personally but only through his police work over four to five years; (2) he had no knowledge of the defendant frequenting the Wongunk Meadows area; and (3) he never told the affiants he had knowledge that the defendant frequented the Meadows. Following this testimony the defendant sought dismissal of the indictment, a mistrial and renewal of his motion to suppress. He further demanded an evidentiary hearing to examine the affiants upon "whether or not there is perjury or reckless disregard." The trial court denied this request on the ground that, even without the disputed paragraph, the affidavit adequately indicated probable cause.

In *Franks* v. *Delaware,* 438 U.S. 154, 171, 98 S. Ct. 2674, 57 L. Ed. 2d 667 (1978), it was held that the truth of an affidavit supporting a search warrant may be challenged at an evidentiary hearing when a proper preliminary showing has been made of deliberate falsity or reckless disregard of the truth on the part of the affiant. "Allegations of negligence or innocent mistake are insufficient." Contrary to the state's claim, the defendant did make a sufficient demonstration of these requirements for such a hearing. Nevertheless, one

additional factor must be considered. "Finally, if these requirements are met, and if, when material that is the subject of the alleged falsity or reckless disregard is set to one side, there remains sufficient content in the warrant affidavit to support a finding of probable cause, no hearing is required." Id., 171–72. The court relied upon this principle in denying the defendant's request for an evidentiary hearing, and we agree with that conclusion.

The memorandum denying the motion to suppress did include a reference to the defendant as a person "known to frequent the area where the victim's body was found," as one of several factors supporting the finding of probable cause. When the defendant challenged the truth of the statement in the affidavit concerning his being "known to frequent the area," the same judge who had denied the motion to suppress concluded that the disputed portion of the affidavit was not essential to his finding of probable cause. Our previous discussion of the circumstances supporting probable cause, which omits any reference to the defendant's frequenting the area where the victim's body was found, makes it apparent that we agree with this conclusion. The most significant facts to be gleaned from the affidavit are that the last person known to have seen the victim alive was the defendant and that the last known place where she was seen alive was the 1976 Mercury automobile that was the subject of the motion to suppress. The truth or falsity of the disputed statement in the affidavit would not alter these facts or the other circumstances recited therein. The trial court was correct in concluding that the challenged information in one paragraph of the affidavit was not essential to a finding of probable cause to search the vehicle. Accordingly, the defendant's motions made upon the basis of Larson's testimony were properly denied, including his renewal of the motion to suppress.

## VI

The defendant makes several claims concerning the nondisclosure or belated disclosure of information that was in the possession of the state and that is claimed to be exculpatory. See *Brady* v. *Maryland,* 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963). Since we have concluded that a new trial must be ordered, that will obviate any prejudice that the defendant may have suffered from the failure to disclose pertinent material at earlier stages of the proceeding, which may have handicapped his pretrial preparation as well as his cross-examination of certain witnesses at the trial. We need not discuss, therefore, his claims that the statements of certain individuals, which were made available to him in the course of the trial, should have been given to him before trial as exculpatory material or in accordance with pretrial discovery orders issued by the court. Accordingly, we do not consider the claimed tardy disclosure of the following items: (1) several documents written by Dean Wilson, a witness called by the state, pertaining to his relationships with the defendant and other witnesses and containing statements inconsistent with his testimony, which were made available several hours before commencement of his cross-examination by the defendant; (2) the complete written statement of Sandy Yurko relating to the victim's drug-selling activities and her fear of a person who supplied her with drugs, a summary[14] of which was given

[14] The principal omission from the summary was a reference in Yurko's statement to a conversation with another person who reported that on Saturday morning, November 18, 1978, he had seen a green van "with the yellow paint over the tires, near where the body was found." Yurko herself stated that the victim in April, 1978, had told her that her supplier, "a guy named Bob who comes from New Britain," drove "a green van with yellow stripes over the tires." The summary given to the defendant long before trial also referred to "a guy named Bob, who (sic) Linda met in East Hartford, and may now live in New Britain," as the victim's principal source of drugs. There is nothing in the record to support the defendant's conten-

to the defendant more than a year before trial; (3) the report of the assistant medical examiner, Charles Chase, dated November 18, 1978, when he examined the body of the victim, which the court found the state to have omitted inadvertently from its response to the discovery order entered pursuant to Practice Book § 741; and (4) the information, received by a state trooper on September 1, 1981, during the trial, but not disclosed to the defendant until October 21, 1981, after the verdict had been returned, which pertained to the possibility that a vehicle may have been stuck in the mud so as to block access to the dirt road to the area where the body was found at about the time when the defendant is claimed to have placed it there.[15]

The first of the two discovery issues remaining involves the denial of the defendant's motion to dismiss the indictment on the ground that the failure to make available the psychiatric records of Dean Wilson, a witness for the state, deprived him of his right of confrontation in that it impaired his ability to cross-examine. Since a motion to dismiss an indictment cannot be made during trial; Practice Book §§ 815, 887; the court properly denied the motion. *State* v. *Maldonado*, 193 Conn. 350, 355 n.3, 478 A.2d 581 (1984). Aside from this technical impropriety, the inability to cross-examine a particular witness would not ordinarily require dismissal of an indictment, though it would warrant striking the testimony of the witness or, in some circumstances, a mistrial. *State* v. *Esposito*, 192 Conn. 166, 179, 471 A.2d 949 (1984); *Gordon* v. *Indusco Management Corporation*, 164 Conn. 262, 271,

---

tion that earlier disclosure of the information concerning the green van allegedly seen near the place where the body was discovered on November 18, 1978, would have materially aided his defense.

[15] This information was the basis for the defendant's motion for a new trial that was made before sentence was imposed. The trial court denied the motion, concluding that the evidence did not sufficiently establish the date of the incident to cause the jury to render a different verdict.

320 A.2d 811 (1973). With respect to the problems that may arise upon the retrial of this case, if the witness should assert his statutory privilege of nondisclosure of his psychiatric treatment records, as he did at the first trial, we refer to our recent decision in *State* v. *Esposito,* supra. See also *State* v. *Bruno,* 197 Conn. 326, 497 A.2d 758 (1985).

The final discovery issue remaining is our review of the trial court's determination, made after an in camera inspection, that certain exhibits, including papers seized by the state from the victim's locker and from her home as well as the complete state investigatory court file, contained nothing exculpatory that should have been disclosed to the defendant pursuant to *Brady* v. *Maryland,* supra. To the extent that the inadequate record on appeal makes such review possible,[16] we have

[16] The papers taken from the victim's school locker and from her home appear to relate wholly to her school work and her diet. The voluminous investigatory file contains numerous photographs and laboratory test reports that are available to the defendant pursuant to Practice Book § 741, whether or not they may be exculpatory. Presumably this material has been fully disclosed in accordance with the defendant's motions. The file also contains statements of witnesses that the defendant would have been entitled to receive and presumably did receive pursuant to Practice Book § 752 after completion of the direct testimony of such witnesses. The inclusion of so much of the material already disclosed to the defendant in the exhibit to be examined by this court has needlessly complicated our task. In fact, a notation in the file signed by trooper Stergio declares that, pursuant to a court order, the attorney for the defendant, assisted by his associate, "reviewed all State's evidence regarding this investigation at the Detective Unit Evidence Room in Meriden, Connecticut." The failure of the defendant, who bears the burden of presenting an adequate record to this court for our review, to arrange for segregating the portions of the file already made available from those claimed not to have been disclosed makes it impossible for this court to determine what items are really at issue. At the retrial of this case, if there is still any evidence in the state's possession that the defendant claims has not been disclosed, the items in dispute should be separated from the remainder of the file and marked for identification and the state should be required to state on the record specific reasons for continuing to withhold such material.

discovered nothing not previously made available that the state would have been required to disclose as exculpatory evidence.

## VII

### A

The defendant claims error in the admission of numerous items of evidence: three glass bottle fragments found near the site of the body that were similar to a glass chip found in the right front wheel well of the 1976 Mercury Cougar; a black boot taken from the defendant's home that contained some human blood insufficient in quantity for analysis as to blood type; soil, sand and undercoating samples collected from the 1976 Mercury and from the area where the body was found that were similar but not necessarily identical; needles collected from the Colorado blue spruce under which the body was found that were similar to needles discovered in the defendant's bedroom; and several other items taken from the defendant's home or the 1976 Mercury that were compared with items found in the area of the body. The basis for objecting to this evidence was that the results of the tests were inconclusive in the sense that they did not establish that the only possible source of any of the items found in the Mercury or the defendant's residence was the place where the body was found, and thus did not prove absolutely that either the car or the defendant had visited that area. Evidence is not rendered inadmissible simply because it is not conclusive. It is admissible if it tends to support a relevant fact even in a slight degree, so long as it is not prejudicial or merely cumulative. "It is not any one fact, but the cumulative impact of a multitude of facts, which establishes guilt in a case, such as this, where there are no eye witnesses to the crime." *State* v. *Walters,* 145 Conn. 60, 69, 138 A.2d 786, cert. denied, 358 U.S. 46, 798 S. Ct. 70, 3 L. Ed. 2d 45 (1958). The defend-

ant's objection goes essentially to the weight of the evidence rather than to its admissibility. We find no error in these rulings.

The court also admitted into evidence, over the defendant's objection, a car coat taken from the Morrill home that contained a smear of blood that was consumed in testing before the defendant was arrested and might have had an opportunity to analyze it. See Practice Book § 738. The results of the test indicated that the blood smear came from a person having type A blood, such as the victim. The defendant had type O blood. The defendant claims that, as a suspect from the start of the investigation, he should have been notified of the test so that an expert representing him could have participated in the testing procedure. The failure to do so, he claims, violated his right to due process of law.

"In considering whether . . . lost or destroyed evidence should be admitted, the trial court has to look to numerous factors including the reason for the unavailability of the evidence, the materiality of the evidence, the likelihood of mistaken interpretation of it by witnesses or the jury, and the prejudice to the defendant caused by the unavailability of the evidence." *State* v. *Hamele,* 188 Conn. 372, 381, 449 A.2d 1020 (1982); see *State* v. *Harden,* 175 Conn. 315, 327, 398 A.2d 1169 (1978); *State* v. *Burns,* 173 Conn. 317, 325, 377 A.2d 1082 (1977). The reason for the unavailability of the evidence in this case is that the testing procedure used necessitated its destruction, a contention of the state that the defendant apparently does not dispute. It is not claimed that the state sought to conceal the evidence or was negligent in retaining it. Although Practice Book § 738 was inapplicable because no disclosure of the object had been ordered, it would, nevertheless, have been desirable for the state to have provided notice to the defendant of the need for

destruction of this evidence in the testing process. We agree, however, that the trial court properly admitted the evidence. The defendant does not seriously contest the finding of the state's expert that the blood on the coat as well as the blood of the victim were both type A. His principal claim is that, with the more sophisticated testing procedures his expert would have used, the blood groupings might have been more narrowly confined. That the evidence was less significant than it might have been if different techniques had been used did not, as far as can be ascertained, prejudice the defendant any more than the state. Counsel had the opportunity to explain the limited probative value of this evidence to the jury and presumably did so. Although the defendant also criticizes the lack of any instruction to the jury concerning this evidence, such as that given in *State* v. *Hamele,* supra, 382 n.5, it does not appear that he made any request for such an instruction.

## B

The defendant also claims that two of the witnesses, Mary Wynne and Dean Wilson, were incompetent to testify about events they claimed to have observed at about the time of the murder because of their claimed use of alcohol or drugs at that time. He does not maintain that either of these witnesses lacked general competency to testify at the time of trial for any reason. The trial court denied his request for a preliminary hearing on the competence of these witnesses to observe and remember events that they purported to have witnessed at about the time of the murder. Our review of the testimony of these witnesses indicates no such deficiency in mental capacity at the time of their observations as to render them incompetent to testify, and the defendant's references to their use of alcohol or drugs in his request for a voir dire of these witnesses did not raise such a serious question of their

testimonial capacity that the trial court should have granted that request. The defendant had an adequate opportunity to cross-examine these witnesses about any impairment of their mental condition relating to their testimony in order to attack their credibility. See *United States* v. *Strahl,* 590 F.2d 10, 12 (1st Cir. 1978), cert. denied, 440 U.S. 918, 99 S. Ct. 1237, 59 L. Ed. 2d 468 (1979).

## VIII

At the time of the trial, the defendant requested that the jury be instructed that, to find the defendant guilty, it must find that the murder took place in Portland, as claimed in the state's bill of particulars. The court declined to give this instruction, and the defendant duly excepted. After the verdict of guilty, the defendant filed a motion in arrest of judgment, alleging that the court lacked jurisdiction because of the lack of evidence concerning the location of the murder. This motion was denied by the court.

"When the state's pleadings have 'informed the defendant of the charge against him with sufficient precision to enable him to prepare his defense and to avoid prejudicial surprise, and were definite enough to enable him to plead his acquittal or conviction in bar of any future prosecution for the same offense, they have performed their constitutional duty.' *State* v. *Sumner,* 178 Conn. 163, 168, 422 A.2d 299 (1979)." *State* v. *Vincent,* 194 Conn. 198, 205, 479 A.2d 237 (1984). The inclusion in the state's pleading of additional details concerning the offense does not make such allegations essential elements of the crime, upon which the jury must be instructed. In *State* v. *Sharpe,* 195 Conn. 651, 667, 491 A.2d 345 (1985), the trial court did not instruct the jury that the assault at issue, which included as an element the use of a "deadly weapon" as defined in General Statutes § 53a-3 (6), must have been committed

only with a "pistol"; General Statutes § 53a-3 (18); as alleged in the state's information. We upheld the conviction, stating that "[t]he statute does not include as a necessary element that the deadly weapon used be a pistol. The use of the term 'pistol' in the information was merely descriptive and not a necessary element of first degree assault." *State* v. *Sharpe,* supra. Similarly, "[i]t is a well-established rule in this state that 'it is not essential in a criminal prosecution that the crime be proved to have been committed on the precise date alleged, it being competent ordinarily for the prosecution to prove the commission of the crime charged at any time prior to the date of the complaint and within the period fixed by the statute of limitations.' *State* v. *Lorusso,* 151 Conn. 189, 191, 195 A.2d 429 [1963]; *State* v. *Bitting,* 162 Conn. 1, 8, 291 A.2d 240 [1971]; see also *Stenz* v. *Sandstrom,* 143 Conn. 72, 75, 118 A.2d 900 [1955]; *State* v. *Horton,* 132 Conn. 276, 277, 43 A.2d 744 [1945]; *State* v. *Ferris,* 81 Conn. 97, 99, 70 A. 587 [1908]." *State* v. *Ramos,* 176 Conn. 275, 276–77, 407 A.2d 952 (1978); see also *State* v. *Orsini,* 187 Conn. 264, 274, 445 A.2d 887, cert. denied, 459 U.S. 861, 103 S. Ct. 136, 74 L. Ed. 2d 116 (1982). Under the facts of this case, we agree with the court in *State* v. *Carrier,* 235 Ind. 456, 463–64, 134 N.E.2d 688 (1956), when it stated that "the fact that the place of death is unknown or that there may be a variance in the proof thereof will not be fatal unless it is made to affirmatively appear that the accused was mislead [sic] or prejudiced thereby. No person should escape punishment for murder because he is so clever as to conceal . . . the place where the victim was killed or died." See generally annot., 59 A.L.R.2d 901 § 10. Here there is no claim of prejudice nor that any of the functions of the state's pleading were unfulfilled due to the lack of specificity in the charge as submitted to the jury. The trial court did not err in refusing to charge on the specific place of the murder as requested.

On the question of jurisdiction, raised by his motion in arrest of judgment, the defendant claims that there is no evidence that the murder took place within the Middlesex judicial district, wherein the town of Portland is located, or even within the state of Connecticut. General Statutes § 51-352c (a) provides that "[a] criminal prosecution shall not fail by reason of the fact that the evidence may disclose the crime to have been committed in a town or judicial district adjoining that alleged in the indictment or information." We need not on this occasion decide whether this statute relates to jurisdiction over the subject matter, as its title implies, or merely to venue, which would have been waived by failure of the defendant to raise a timely objection thereto. The Middlesex judicial district is bordered by the Hartford-New Britain, New Haven and New London judicial districts. All of the evidence presented by either party concerned events that took place either in the Middlesex judicial district, where the body of the victim was found, or in the judicial district of Hartford-New Britain. There was sufficient evidence for the court to find that the crime occurred in the Middlesex judicial district or some adjoining district, and that it therefore had jurisdiction to hear the case. Thus, the court did not err in denying the defendant's motion in arrest of judgment.

There is error in the admission of the testimony discussed in part IV of this opinion; the judgment is set aside and the case is remanded for a new trial.

In this opinion the other judges concurred.