STATE OF CONNECTICUT *v.* MALCOLM LYTELL
(13235)

PETERS, C. J., HEALEY, SHEA, GLASS and COVELLO, Js.

Argued January 12—decision released March 22, 1988

*John W. Watson,* assistant public defender, with whom, on the brief, was *Joette Katz,* public defender, for the appellant (defendant).

*Guy W. Wolf III,* assistant state's attorney, with whom, on the brief, was *Arnold Markle,* state's attorney, for the appellee (state).

GLASS, J. The defendant, Malcolm Lytell, was charged with two counts of the crime of robbery in the first degree in violation of General Statutes § 53a-134 (a) (4),[1] one count of the crime of larceny in the second degree

---

[1] General Statutes § 53a-134 (a) (4) provides: "ROBBERY IN THE FIRST DEGREE: CLASS B FELONY. (a) A person is guilty of robbery in the first degree when, in the course of the commission of the crime or of immediate flight therefrom, he or another participant in the crime . . . (4) displays or threatens the use of what he represents by his words or conduct to be a pistol, revolver, rifle, shotgun, machine gun or other firearm; except that in any prosecution under this subdivision, it is an affirmative defense that such pistol, revolver, rifle, shotgun, machine gun or other firearm was not a weapon from which a shot could be discharged. Nothing contained in this subdivision shall constitute a defense to-a prosecution for, or preclude a conviction of, robbery in the second degree, robbery in the third degree or any other crime."

in violation of General Statutes § 53a-123 (a) (2),[2] and one count of the crime of using a motor vehicle without the owner's permission in violation of General Statutes § 53a-119b (a) (1).[3] He was tried by a jury and found guilty on all counts. On May 23, 1986, the trial court, *Hadden, J.,* sentenced the defendant to a total effective sentence of imprisonment of twenty-one years. The defendant now appeals, raising four claims: (1) that he was deprived of a fair trial due to the introduction into evidence of his postarrest refusal to name his alibi witnesses; (2) that the trial court erred in its instruction to the jury on fingerprint evidence; (3) that the trial court erred in its instruction to the jury on proof beyond a reasonable doubt; and (4) that conviction and punishment for two counts of the crime of robbery in the first degree violated his due process and double jeopardy rights under the federal and state constitutions. We find no error.

The jury could reasonably have found that on November 7, 1985, at approximately 12:30 p.m., Anthony Guarino, the owner of the Congress Cafe (cafe) in New Haven, and his wife, Mary, were robbed by three black males. The Guarinos had driven to the cafe in Mary's car which they had parked in front of the cafe door. Harry Dailey, the night bartender, was with the Guarinos when the three black males entered the cafe and announced that it was a "stickup." One man was armed

---

[2] General Statutes § 53a-123 (a) (2) provides: "LARCENY IN THE SECOND DEGREE: CLASS C FELONY. (a) A person is guilty of larceny in the second degree when he commits larceny as defined in section 53a-119 and . . . (2) the value of the property or service exceeds five thousand dollars."

[3] General Statutes § 53a-119b (a) (1) provides: "USING MOTOR VEHICLE OR VESSEL WITHOUT OWNER'S PERMISSION. INTERFERING OR TAMPERING WITH A MOTOR VEHICLE. FIRST OFFENSE: CLASS A MISDEMEANOR: SUBSEQUENT OFFENSE: CLASS D FELONY. (a) A person is guilty of using a motor vehicle without the owner's permission when: (1) He operates or uses, or causes to be operated or used, any motor vehicle unless he has the consent of the owner."

with a gun and one man was carrying a stick or tree branch. The man with the gun ordered Mr. Guarino and Dailey to lie down on the floor. Mrs. Guarino panicked and began throwing glasses at the men. The two men without guns pushed her to the floor and hit her with the stick.

The men then took approximately $1500 from Mr. Guarino's pockets and a bank bag containing $6000 that they had ordered Mrs. Guarino to retrieve from a closet behind the bar. The men then took Mrs. Guarino's car keys and drove away in her car. Approximately five minutes after the robbery, Mrs. Guarino's car was found abandoned in a vacant lot a short distance from the cafe. A green ski mask worn by one of the men was found inside the car. Mrs. Guarino's purse and car keys were missing. The car was "dusted" for fingerprints, and one that was identified as the defendant's was found on the exterior of the driver's window.

At the time of the robbery one of the state's witnesses, Dennis Sims, lived two blocks away from the cafe. Sims and the defendant had known each other for approximately five years and had regular, personal contact. On the day of the robbery, while walking past the cafe, Sims had noticed the defendant and two other men across the street from the bar. Later Sims saw the men run across the street and enter the bar. Sims, knowing "what was going down," retreated, and shortly thereafter saw the three men leave the bar and drive away in Mrs. Guarino's car.

Later, Sims approached Detective Jerry Waller, who had been dispatched to the area of the cafe, and told Waller that he thought he might be wanted for a robbery he had not committed. He stated that if Waller would "see what's happening in [his] case," he might have some useful information. Waller found no warrant for Sims' arrest and arranged to meet him around

the corner. At that meeting Sims told Waller that the defendant was involved in the robbery. The next day Sims went to the police station and made a photographic identification of the defendant. Sims also identified the defendant at trial.

The defendant was arrested on November 13, 1985. After executing a written waiver of his *Miranda* rights; *Miranda* v. *Arizona,* 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966); the defendant made an oral statement to Detective Robert Coffey, in which he claimed to have been hosting or running a card game in Waterbury at the time of the robbery. When Coffey asked the defendant for the names and addresses of the persons in the card game to enable him to investigate the defendant's alibi claim, the defendant refused to give such information. Coffey then told the defendant that his fingerprint had been found on Mrs. Guarino's car, and the defendant replied that that was "impossible" because he had never been in or near the car.

I

The defendant's first claim is that he was deprived of a fair trial by the introduction of his postarrest refusal to name his alibi witnesses. The defendant specifically relies on *Doyle* v. *Ohio,* 426 U.S. 610, 96 S. Ct. 2240, 48 L. Ed. 2d 91 (1976), for the proposition that a defendant's silence after having been arrested and having received *Miranda* warnings may not be used to impeach his trial testimony. We hold that the principles of *Doyle* are inapplicable to the facts of this case, and that our recent decision in *State* v. *Talton,* 197 Conn. 280, 497 A.2d 35 (1985), is dispositive of this issue.

In *Talton,* the defendant was charged with first degree sexual assault, and after waiving his *Miranda* rights refused to answer a question regarding the name of the woman he claimed to have been with at the time

of the assault. The state presented evidence of his refusal to answer the question at the trial. We stated: "The *Doyle* decision, however, is not applicable to the facts of this case. The crucial distinction is that, here, the defendant did not remain silent after he was arrested and advised of his rights. After being given *Miranda* warnings, the defendant clearly chose to forego his right to remain silent. Once an arrestee has waived his right to remain silent, the *Doyle* rationale is not operative because the arrestee has not remained silent and an explanatory statement assuredly is no longer 'insolubly ambiguous.' By speaking, the defendant has chosen unambiguously not to assert his right to remain silent. He knows that anything he says can and will be used against him and it is manifestly illogical to theorize that he might be choosing not to assert the right to remain silent as to part of his exculpatory story, while invoking that right as to other parts of his story. While a defendant may invoke his right to remain silent at any time, even after he has initially waived his right to remain silent, it does not necessarily follow that he may remain 'selectively' silent." *State* v. *Talton,* supra, 295. Thus in *Talton,* the defendant's "expression of a disinclination to answer one question was not tantamount to any assertion of his fifth amendment right." Id.

Similarly, the defendant's actions in this case cannot be construed as an invocation of his fifth amendment right. As in *Talton,* the defendant waived his *Miranda* rights and voluntarily discussed the events of the day in question with Coffey. After the defendant had refused to provide the names and addresses of the alibi witnesses, the questioning continued. Specifically, Coffey stated that the defendant's fingerprint had been found on Mrs. Guarino's car. The defendant expressed his disbelief and then Coffey again asked the defendant to name his alibi witnesses. At this point the

defendant requested an attorney and the interrogation was terminated. The first refusal to name the witnesses came before the defendant's invocation of his fifth amendment rights. Thus, the *Talton* rationale applies and the defendant's refusal to answer the question regarding the identity of his alibi witnesses was properly admitted as evidence at trial.

## II

The defendant's second claim is that the trial court erred in refusing to charge the jury as requested on fingerprint evidence. The defendant argues that when fingerprint evidence is presented in a trial, the charge to the jury must contain an instruction that "[u]nless it can be shown that the circumstances are such that the fingerprints could have been impressed only at the time the crime was perpetrated, the presence of the defendant's fingerprints does not establish his connection with the crime charged." *State* v. *Mayell,* 163 Conn. 419, 426, 311 A.2d 60 (1972); see also *State* v. *Payne,* 186 Conn. 179, 182, 440 A.2d 280 (1982). We squarely addressed this issue in our recent decision in *State* v. *Santangelo,* 205 Conn. 578, 599, 534 A.2d 1175 (1987), where we stated that "[s]uch an instruction is germane where the fingerprints of an accused constitute the only evidence, or the principal evidence to convict."

In this case, the fingerprint evidence was not the only or principal evidence implicating the defendant. He was positively identified by a witness who had known him for a number of years. Further, the Guarinos' descriptions of the height, build and beard of one of the robbers was consistent with the defendant's appearance. Finally, the defendant knew that the Guarinos kept a large sum of money in the cafe to cash payroll checks. Thus, the trial court was under no obligation to give the requested fingerprint instruction because of the significant other evidence in this case.

## III

The defendant next claims that the trial court erred in its charge on proof beyond a reasonable doubt. The trial court's first definition of reasonable doubt was "[r]easonable doubt means this: It is a doubt for which a reasonable person can give a valid reason." The defendant argues that this definition and the entire charge on reasonable doubt impermissibly lowered the state's burden of proof. We are unpersuaded.

It is well settled that a jury instruction is to be examined in its entirety, and that the test to be applied is whether the charge as a whole presents the case to the jury so that no injustice will be done. *State* v. *Derrico,* 181 Conn. 151, 170, 434 A.2d 356, cert. denied, 449 U.S. 1064, 101 S. Ct. 789, 66 L. Ed. 2d 607 (1980). Previously, we have upheld the "valid reason" definition of reasonable doubt when the charge in its entirety provides the jury with sufficient guidance as to the "beyond a reasonable doubt" standard of proof. Id. The trial court made a number of careful explanations of the reasonable doubt standard, many of which were identical to those used by the trial court and approved by this court in *State* v. *Derrico,* supra.[4] Reviewing the

[4] The trial court charged the jury on the proof beyond a reasonable doubt standard as follows: "The law says that the State must not only prove him guilty, but must prove him guilty beyond a reasonable doubt. It is not enough for the State to make out a case of even probable guilt, but the burden on the State, which never shifts, is to prove the accused guilty beyond a reasonable doubt. It is not required that the State prove the defendant guilty beyond all possible doubt.

"Reasonable doubt means this: It is a doubt for which a reasonable person can give a valid reason. The burden of proving his guilt beyond a reasonable doubt requires the State to prove sufficient evidence to create in your minds a strong and abiding conviction of the guilt of the accused.

"In other words, it is the law that the evidence must be so sufficient that it would leave no room in your minds for any reasonable hypothesis of the innocence of the accused.

"A reasonable doubt is not a doubt raised by one who questions for the sake of raising a doubt. A reasonable doubt is not a surmise or speculation

instruction in its entirety, we find that it fairly presented the proof beyond a reasonable doubt standard so that no injustice was done.

## IV

The defendant's final claim is that conviction and punishment for two counts of the crime of robbery in the first degree violated his double jeopardy and due process rights under the federal and state constitutions. The defendant was charged and convicted for one count of robbery in the first degree perpetrated against Anthony Guarino, and for a second count of robbery in the first degree perpetrated against Mary Guarino. We find no error.

It is well settled that "[t]he proper double jeopardy inquiry when a defendant is convicted of multiple vio-

---

or conjecture or an imaginary doubt. A reasonable doubt is not a captious or a frivolous doubt nor a doubt which is raised by the ingenuity of counsel or by a juror and is unwarranted by the evidence, nor is it a doubt prompted by sympathy for the accused. A reasonable doubt is an honest doubt, a real doubt, a doubt which has its foundation in the evidence offered in the case or the lack of evidence.

"Absolute certainty in the affairs of life is almost never attainable and the law does not require absolute certainty to authorize a conviction. What it does require is that the guilt be established as charged beyond a reasonable doubt, which is one founded upon the evidence, one which you as reasonable and prudent men and women would be willing to act upon the more weighty and important matters relating to your own affairs. It is proof wholly consistent with the defendant's guilt and inconsistent with any other rational conclusion."

In *State* v. *Derrico,* 181 Conn. 151, 171 n.4, 434 A.2d 356 (1980), we approved the following jury charge: "A reasonable doubt is not such a doubt as may be raised by one questioning for the sake of raising a doubt. It is not a surmise or a guess or a conjecture. It is not hesitation springing from feelings of sympathy or pity for the accused or members of his family or other persons who might in any way be affected by your verdict. A reasonable doubt is one founded upon the evidence; one which grows out of the evidence or the lack of evidence in the case. It is one for which you can, in your own mind, conscientiously give a reason. A reasonable doubt is a square and honest doubt, grounded on reason; one which appeals to reason. If the facts you may find proven can reasonably be explained in any other way than that the accused is guilty, you must, of course, render your verdict in his favor."

lations of the *same* statutory provision is whether the legislature intended to punish the individual acts separately or to punish only the course of action which they constitute. *Albernaz* v. *United States,* 450 U.S. 333, 337, 101 S. Ct. 1137, 67 L. Ed. 2d 275 (1981); *Whalen* v. *United States,* 445 U.S. 684, 691, 100 S. Ct. 1432, 63 L. Ed. 2d 715 (1980)." (Emphasis in original.) *State* v. *Rawls,* 198 Conn. 111, 121, 502 A.2d 374 (1985). As we noted in *State* v. *Madera,* 198 Conn. 92, 109, 503 A.2d 136 (1985), "the issue, though essentially constitutional, becomes one of statutory construction." We have recently interpreted a number of criminal statutes to determine the same issue: whether the legislature intended to allow punishment for two separate violations of the same statutory provision. See, e.g., *State* v. *Bunkley,* 202 Conn. 629, 659–60, 572 A.2d 795 (1987) (manslaughter and assault); *State* v. *Rawls,* supra, 119–22 (narcotics possession); *State* v. *Madera,* supra, 108–10 (arson murder); *State* v. *Couture,* 194 Conn. 530, 565–66, 482 A.2d 300 (1984), cert. denied, 469 U.S. 1192, 105 S. Ct. 967, 83 L. Ed. 2d 971 (1985) (felony murder). In these cases, we found that the pivotal question was whether the statutes defined crimes against the individual persons.

In *State* v. *Couture,* supra, 565, construing the felony murder statute, we stated that "[t]he statute refers to the death of 'a person' in the singular. A fundamental purpose of the criminal law is to protect individual citizens from the criminal conduct of another. People are neither fungible nor amorphous. Where crimes against persons are involved, a separate interest of society has been invaded for each violation. Therefore when two or more persons are the victims of a single episode there are as many offenses as there are victims. *State* v. *Gunter,* 132 Ariz. 64, 70, 643 P.2d 1034 (1982); *State* v. *Irvin,* 603 S.W.2d 121 (Tenn. 1980); *Vigil* v. *State,* 563 P.2d 1344, 1351 (Wyo. 1977). As the Wyoming

Court so aptly stated in *Vigil* (p. 1351): 'It must be noted that "any human being" is in the singular and there is no indication that the defendant can get a bargain rate if he assaults a group of human beings.' "

Similar to the felony murder statute in *Couture,*[5] and the assault and manslaughter statutes in *Bunkley,*[6] General Statutes § 53a-133 defines robbery as a crime against the person: "A person commits robbery when, in the course of committing a larceny, he uses or threatens the immediate use of physical force upon *another person* . . . ." (Emphasis added.) The defendant argues that § 53a-133 is ambiguous, and that absent a clear legislative intent the ambiguity should be resolved in favor of lenity. We disagree, as we find that the plain language of § 53a-133 clearly mandates punishment for each and every robbery of each and every person, irrespective of whether the robbery was spatially linked with another robbery.

There is no error.

In this opinion the other justices concurred.

---

[5] General Statutes § 53a-54c provides in pertinent part: "A person is guilty of murder when, acting either alone or with one or more persons, he commits . . . robbery . . . and, in the course of and in furtherance of such crime . . . he, or another participant . . . caused the death of *a person* other than one of the participants . . . ." (Emphasis added.)

[6] General Statutes § 53a-56 (a) (1) authorizes a finding of guilt for manslaughter for one who "causes the death of *another person.*" (Emphasis added.) *State* v. *Bunkley,* 202 Conn. 629, 660, 572 A.2d 795 (1987). General Statutes § 53a-61 (a) (2), the assault statute, "uses the language 'causes serious physical injury to *another person.*' " (Emphasis in original.) Id.