******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

STATE OF CONNECTICUT *v.* CORDARYL SILVA
(AC 38313)

Sheldon, Prescott and Norcott, Js.

*Argued March 7—officially released June 14, 2016*

(Appeal from Superior Court, judicial district of
Ansonia-Milford, Markle, J.)

*Glenn W. Falk*, assigned counsel, for the appellant (defendant).

*Brett R. Aiello*, special deputy assistant state's attorney, with whom, on the brief, were *Kevin D. Lawlor*, state's attorney, and *Charles M. Stango*, supervisory assistant state's attorney, for the appellee (state).

*Opinion*

SHELDON, J. The defendant, Cordaryl Silva, appeals from the judgment of conviction for murder in violation of General Statutes § 53a-54a (a),[1] which was rendered against him after a jury trial. The defendant appeals on two grounds: (1) that the trial court improperly denied his request for self-representation, and thus denied him his sixth[2] and fourteenth[3] amendment right to represent himself; and (2) that the state improperly used his post-*Miranda*[4] silence to imply his guilt, thus violating his fifth[5] and fourteenth[6] amendment privilege against self-incrimination. We affirm the judgment of the trial court.

The jury reasonably could have found the following facts. In 2012, the police were investigating the victim, Javon Zimmerman, and the victim's brothers, Keyshon and Roo, for drug sale activity. The defendant had an ongoing feud with the Zimmermans. The feud stemmed from the Zimmermans' failure to make promised payments to the prison commissary account of the defendant's half-brother, Stephen Cook. In 2009, Cook had shot and killed a drug dealer, Kieran Stanley, at the request of the Zimmermans. The feud came to a head on May 12, 2012, when the defendant approached the victim while he was in a vehicle in the parking lot of RJ's Café, a bar in Derby. After the victim jumped out of the vehicle, the defendant walked toward him, said, "Fuck you, Javon," and shot him two times. The victim died in the parking lot.

The jury returned a verdict of guilty on April 8, 2014, and on the basis of that verdict, the court found that the defendant had violated his probation. On June 24, 2014, the court sentenced him to fifty years incarceration plus ten years of special parole on his conviction for murder and three years for the violation of probation, to run concurrently, for a total effective sentence of fifty years incarceration plus ten years of special parole. This appeal followed. Additional facts will be set forth as necessary.

I

We first address the defendant's claim that the trial court abused its discretion by denying his request for self-representation in violation of his right to self-representation under the sixth and fourteenth amendments. The defendant argues that he made a clear and unequivocal request to represent himself that the court denied for improper reasons. More specifically, the defendant argues that the court abused its discretion in denying his request for self-representation because it based its denial on what it thought were his frivolous reasons for wanting to represent himself, not on any delay or disruption of the trial that was likely to result from his self-representation.

The following additional facts are relevant to this claim. Prior to trial, the defendant's special public

defender, Lawrence Hopkins, filed a motion to withdraw his appearance because the defendant and his mother had filed grievances against him. On April 9, 2013, at a hearing on the motion to withdraw, Hopkins told the court, "I really think it's in [the defendant's] best interests to have another attorney. Communications between [him and me] have been bad, at best. The situation between the family and [me], I would best describe as antagonistic." The court, *Iannotti, J.*, did not act on Hopkins' motion. Instead, it continued the case until July 9 to give the defendant or his parents time to hire new counsel. The defendant never retained new counsel, however, and so three days of jury selection began on February 25, 2014, with Hopkins representing the defendant.

On the morning of April 1, 2014, just as the court, *Markle, J.*, was announcing that it was ready to bring in the jurors to start hearing the evidence at trial, the defendant interrupted the judge and asked permission to address the court. The court allowed the defendant to make a statement in which he described his long-standing difficulties with Hopkins. He said that he believed that Hopkins was not working on his behalf. The defendant went on to describe Hopkins' failure to follow up with two witnesses who would have purportedly testified that he had not shot Javon Zimmerman, but who would not be willing to identify the actual shooter. In addition, the defendant recounted several instances in which he felt that Hopkins had lied to him. The defendant also described his disagreement with Hopkins' trial strategy, including as to the witnesses to be called and the jurors to be selected. Hopkins disputed several of the defendant's accusations and provided an explanation as to why certain witnesses had not been called: "I don't know who they are. And if in fact they exist and they were a witness to this thing or are going to suggest that they saw someone else shoot this person but they won't say who it is, that gives me grave doubts as to, number one, their veracity, and number two, their very existence." The court explained to the defendant that his concerns about his attorney had already been resolved on pretrial motions, and thus announced that it was prepared to move on with the evidence.

Later that day, after the court gave the jury preliminary instructions, Hopkins made the following statement to the court, outside the presence of the jury: "Your Honor, against my advice [the defendant] has decided that he wants to—that he would like to represent himself throughout the course of these proceedings. I indicated to him that while that is not advisable, number one, it will not delay the process, that we're here, ready to go.

"I indicated that it is customary that a lawyer would be appointed as standby counsel, which is a role I am

happy to assume. I also indicated to him that the rules require that I not sit at defense table with him, but be available in the courtroom in case he has any legal questions for me, and I am certainly willing to do that."

The court asked the defendant if Hopkins was correct as to the reasons why he wanted to represent himself, and the defendant responded, "No, I didn't want self-representation. I wanted new representation. I was just . . . asking him about my defense, and I asked him, could I subpoena a couple of people, and he said no." The court then advised the defendant not to discuss his defense on the record, but the defendant continued, "I just asked him a question about whether I can subpoena some people. He is telling me no, and he said, well, the only way you are going to subpoena people . . . or ask questions that you have is if you represent yourself. So, he basically gave me no option but to just sit here and go with something I don't even know about because he won't even tell me his plan; he won't tell me nothing. He said, just represent yourself. So, he is putting me in a rock and a hard place. I don't know what to do." The court then said, "Well, based on that, I am not going to grant you your motion for self-repre-sentation. Legally, that's—besides being at the absolute eve of the trial and the witnesses being called [are] here to start, besides the procedural aspects, the question of when and how subpoenas are rendered can be best addressed by an attorney . . . not by somebody with-out the experience." The defendant, however, persisted, "Can I ask you a question? Is there no way that you can order him to work with me? Is there no way that the court can order him to work with me and that we can both work together on this case, instead of him just saying he do it his way or it's no way at all? Is there any way that you can . . . get him to work with me or at least meet me halfway?" Hopkins then said, "The question [is], do you want to represent yourself or not; that's the question, yes or no." The defendant did not answer that question, instead asking, "The ques-tion is, can you work with me?"

The court then canvassed the defendant, eliciting from him that he was twenty-six years old, had a general equivalency diploma, and had worked in construction with his father and as a dishwasher. The court, again, stated, "I am going to deny your request for self-repre-sentation. I am sure that Attorney Hopkins knows what the law is in regard to issuing subpoenas, and I have confidence that if there is a witness to be subpoenaed that counsel is aware of the statutory provisions where it is allowed, and how it is allowed, and when it is allowed, and I am not sure that you do. So I don't think self-representation on that basis is appropriate." Following that colloquy, the jurors were invited to reen-ter the courtroom, and the state began to present its case.

After several state's witnesses had testified on the morning and in the early afternoon of the first day of trial, Hopkins again informed the court that the defendant wished to address it. The following discussion then ensued:

"The Defendant: Excuse me, Your Honor. I notice during the cross-examination they are not bringing none of the details. This guy said that, in his statement, that Javon walked up on me and I shot him. Therefore, he clearly said I walked up on Javon; that was a contradiction in his first statement. He said I had a . . . .38 revolver. Later on another witness said I had a nine millimeter. Them is clear, big contradictions that could cause reasonable doubt, but he is not bringing those up. He is not asking about my clothes. There's a big argument about my clothes, and he is not asking any of the witnesses about my clothes or nothing . . . I feel like . . . he is missing a big part of the case.

"The Court: . . . [Q]uite frankly, I will tell you that . . . you have an attorney to make some strategic decisions about what to cross-examine and what not to cross-examine on, what is relevant, what is not relevant. And sir, on every objection that you make at this point, your counsel, I see him doing a more than adequate job. He has cross-examined this witness as to any underlying motivation he may have toward the testimony. I can't—from what you just told me, I can't make a determination as to whether those things, at this point, are relevant or not or the circumstances. So, I don't—I am not going to—

"The Defendant: He never even asked—Officer Roger arrested me a few times. He said he don't remember me. Here it is on record that he arrested me. I had several run-ins with Derby police in 2008. He clearly lied up there.

"The Court: I don't know that as a fact, sir.

"The Defendant: Why would I lie in acing[7] my police records?

"The Court: All right.

"The Defendant: We can take a break and you can look it up online if you think I am lying. They clearly—I feel like I am getting railroaded.

"The Court: All right, sir.

"The Defendant: All right. I don't have nothing else to say.

"The Court: I am not going to—

"[Defense Counsel]: You don't want to do it yourself?

"The Defendant: Yes.

"[Defense Counsel]: Well, tell her.

"The Defendant: Can I please represent myself from

forward because I feel I can do a better job than cross-examining than he is.

"The Court: All right. We're going to take a brief recess." (Footnote added.)

After the recess, the court ruled as follows: "[D]uring the recess I considered your comments and listened to your objections that you made on the record before we took the recess. During the recess, to let you know, I spoke with your attorney and the state, and I advised them in advance of the ruling I am about to make. But first, before I make that ruling, I am going to give you some advice, advice from the court.

"I listened to your objection concerning what you considered to be a lack of cross-examination of the officer concerning what you say that he knew you, and there were prior arrests and he knew you by prior arrests. What you don't understand is that, sir, that decision to cross-examine concerning the prior arrests, you may not understand this, but that would have been very prejudicial to you to have the jury, who has been advised constantly that there is a presumption of innocence, to be then told that you have had prior arrests. That information will be prejudicial to you. As a matter of fact, if the state was to try to offer that evidence in, the court would have ruled that it is inadmissible because it is prejudicial to you. Understood?

"So, and I say this to you because these are strategic decisions that an experienced [attorney], like Mr. Hopkins, makes after spending years in a trial court and knowing what is relevant, what is a strategic plan to defend you, and what would not be a smart choice.

"So, if you didn't understand why your attorney did not cross-examine that officer in the manner that you wanted, I was going to explain it to you because I think your attorney has explained it to you and you just choose not to listen.

"So, again, emphasizing that this was the type—the nature of the evidence that the court would have ruled inadmissible. In plain words, it would have hurt you in your case. And again, your inability to comprehend that fact, along with other strategic decisions that Mr. Hopkins is making on your behalf, is another reason why the court will not allow you to represent yourself because you have the inability to understand when strategic decisions are being made in your best interest.

"So, I am going to remind you once again that you may know it, but Mr. Hopkins is an experienced criminal defense litigator who has been doing this for many years.

"So, from this point forward, Mr. Silva, I am going to decline any further objections made by you concerning trial strategy.

"The Defendant: Can I say one thing?

"The Court: No. No. You're not going to say anything right now."

Following that exchange, the state proceeded with its case, and the issue of self-representation was not raised at trial again.

The defendant now claims that the court erroneously denied his clear and unequivocal request for self-representation. The state disputes this claim, arguing first that the defendant did not make a clear and unequivocal request to represent himself and, second, that even if his request was clear and unequivocal, the court properly denied it.

"The sixth amendment to the United States constitution provides in relevant part: In all criminal prosecutions, the accused shall enjoy the right . . . to have the assistance of counsel for his defense. The sixth amendment right to counsel is made applicable to state prosecutions through the due process clause of the fourteenth amendment. . . . In *Faretta* v. *California*, [422 U.S. 806, 807, 95 S. Ct. 2525, 45 L. Ed. 2d 562 (1975)] the United States Supreme Court concluded that the sixth amendment [also] embodies a right to self-representation and that a defendant in a state criminal trial has a constitutional right to proceed without counsel when he voluntarily and intelligently elects to do so. . . . In short, forcing a lawyer upon an unwilling defendant is contrary to his basic right to defend himself if he truly wants to do so. . . .

"It is well established that [t]he right to counsel and the right to self-representation present mutually exclusive alternatives. A criminal defendant has a constitutionally protected interest in each, but since the two rights cannot be exercised simultaneously, a defendant must choose between them. When the right to have competent counsel ceases as the result of a sufficient waiver, the right of self-representation begins. . . . Put another way, a defendant properly exercises his right to self-representation by knowingly and intelligently waiving his right to representation by counsel. . . .

"State and federal courts consistently have discussed the right to self-representation in terms of invoking or asserting it . . . and have concluded that there can be no infringement of the right to self-representation in the absence of a defendant's proper assertion of that right. . . . The threshold requirement that the defendant clearly and unequivocally invoke his right to proceed pro se is one of many safeguards of the fundamental right to counsel. . . . Accordingly, [t]he constitutional right of self-representation depends . . . upon its invocation by the defendant in a clear and unequivocal manner. . . . In the absence of a clear and unequivocal assertion of the right to self-representation, a trial court has no independent obligation to inquire into the defendant's interest in representing himself

. . . . [Instead] recognition of the right becomes a matter entrusted to the exercise of discretion by the trial court. . . . Conversely, once there has been an unequivocal request for self-representation, a court must undertake an inquiry [pursuant to Practice Book § 44-3], on the record, to inform the defendant of the risks of self-representation and to permit him to make a knowing and intelligent waiver of his right to counsel. . . .

"Although a clear and unequivocal request is required, there is no standard form it must take. [A] defendant does not need to recite some talismanic formula hoping to open the eyes and ears of the court to [that] request. Insofar as the desire to proceed pro se is concerned, [a defendant] must do no more than state his request, either orally or in writing, unambiguously to the court so that no reasonable person can say that the request was not made. . . . Moreover, it is generally incumbent upon the courts to elicit that elevated degree of clarity through a detailed inquiry. That is, the triggering statement in a defendant's attempt to waive his right to counsel need not be punctilious; rather, the dialogue between the court and the defendant must result in a clear and unequivocal statement. . . .

"Finally, in conducting our review, we are cognizant that the context of [a] reference to self-representation is important in determining whether the reference itself was a clear invocation of the right to self-representation. . . . The inquiry is fact intensive and should be based on the totality of the circumstances surrounding the request . . . which may include, inter alia, whether the request was for hybrid representation . . . or merely for the appointment of standby or advisory counsel . . . the trial court's response to a request . . . whether a defendant has consistently vacillated in his request . . . and whether a request is the result of an emotional outburst . . . ." (Emphasis omitted; internal quotation marks omitted.) *State* v. *Pires*, 310 Conn. 222, 230–32, 77 A.3d 87 (2013).

"Our cases establish that a trial court's duty, after a defendant has waived his right to counsel and invoked his right to represent himself, is to determine whether the defendant's waiver and invocation of the right were knowing and intelligent. . . . If it is, the court must, in most cases, grant the defendant's request. This right is even nearer to absolute when it is invoked at the preliminary stages of the proceedings . . . . Prior to trial, a court is not free to investigate the adequacy of defense counsel and, upon discovering that counsel is providing adequate assistance, require the defendant to continue to be represented by counsel. . . . The right to represent oneself is not only exercisable when a defendant is dissatisfied with counsel. It also protects a defendant's interest in autonomy and his right to put on his own defense, at all critical stages of the proceed-

ings. See, e.g., *McKaskle* v. *Wiggins*, 465 U.S. 168, 174, 104 S. Ct. 944, 79 L. Ed. 2d 122 (1984) ('[t]he pro se defendant must be allowed to control the organization and content of his own defense, to make motions, to argue points of law, to participate in voir dire, to question witnesses, and to address the court and the jury at appropriate points in the trial'). Indeed, a defendant is entitled to represent himself when he is competent to do so and chooses to do so knowingly and intelligently." (Citations omitted; footnote omitted.) *State* v. *Braswell*, 318 Conn. 815, 833–34, 123 A.3d 835 (2015).

However, "[a] defendant's right to self-representation is not unqualified when that request is made after trial proceedings have commenced—even if the request is clear and unequivocal. Under *Faretta* v. *California*, supra, 422 U.S. 806–807, a trial court may deny a defendant his right to self-representation, inter alia, if he makes the request in untimely fashion such that granting it would disrupt the proceedings. . . . With respect to the timeliness ground [for denial], the [United States Court of Appeals for the] Second Circuit has stated previously that [a] criminal defendant must make a timely and unequivocal request to proceed pro se in order to ensure the orderly administration of justice and prevent the disruption of both the pre-trial proceedings and a criminal trial. . . . Assuming, however, that a defendant's request to proceed pro se is informed, voluntary and unequivocal, [t]he right of a defendant in a criminal case to act as his own lawyer is unqualified if invoked prior to the start of the trial. . . . Distinct considerations bear upon requests made after a trial has begun. . . . After the commencement of a trial, the right of self-representation is sharply curtailed . . . and a trial court faced with such an application must balance the legitimate interests of the defendant in self-representation against the potential disruption of the proceedings already in progress. . . . Trial commences, for this purpose, at voir dire. . . .

"In [*State* v. *Flanagan*, 293 Conn. 406, 978 A.2d 64 (2009)], we adopted the Second Circuit's balancing test to determine whether the defendant made his request in untimely fashion such that granting it would disrupt the proceedings . . . . [Id., 432–33]. We concluded that, when a defendant clearly and unequivocally has invoked his right to self-representation after the trial has begun, the trial court must consider: (1) the defendant's reasons for the self-representation request; (2) the quality of the defendant's counsel; and (3) the defendant's prior proclivity to substitute counsel. If, after a thorough consideration of these factors, the trial court determines, in its discretion, that the balance weighs in favor of the defendant's interest in self-representation, the court must then proceed to canvass the defendant in accordance with Practice Book § 44-3 to ensure that the defendant's choice to proceed pro se has been made in a knowing and intelligent fashion. If, on the other

hand, the court determines, on the basis of those criteria, that the potential disruption of the proceedings already in progress outweighs the defendant's interest in self-representation, then the court should deny the defendant's request and need not engage in a § 44-3 canvass. . . . Trial courts' decisions to deny requests for self-representation that are made after the commencement of trial are reviewed for abuse of discretion." (Citations omitted; emphasis omitted; internal quotation marks omitted.) *State* v. *Pires*, supra, 310 Conn. 251–53.

"[I]n determining whether there has been an abuse of discretion, every reasonable presumption should be made in favor of the correctness of the trial court's ruling, and we will upset that ruling only for a manifest abuse of discretion. . . . Despite this deferential standard, the trial court's discretion is not absolute. . . . Thus, [i]n reviewing a claim of abuse of discretion, we have stated that [d]iscretion means a legal discretion, to be exercised in conformity with the spirit of the law and in a manner to subserve and not to impede or defeat the ends of substantial justice. . . . In general, abuse of discretion exists when a court could have chosen different alternatives but has decided the matter so arbitrarily as to vitiate logic, or has decided it based on improper or irrelevant factors." (Citations omitted; internal quotation marks omitted.) *State* v. *Jacobson*, 283 Conn. 618, 626–27, 930 A.2d 628 (2007).

We first address whether the defendant made a clear and unequivocal request to represent himself. The defendant's first purported request to represent himself was made by the defendant's attorney prior to the commencement of evidence but after voir dire. The first request was not clear and unequivocal because the defendant expressly disavowed his attorney's request for self-representation when he said that he "didn't want self-representation." Accordingly, at that time, "the dialogue between the court and the defendant" did not "result in a clear and unequivocal statement" that the defendant wished to represent himself. (Emphasis omitted; internal quotation marks omitted.) *State* v. *Flanagan*, supra, 293 Conn. 424.

The defendant did, however, make a clear and unequivocal request to represent himself later on the first day of trial. At that point, he addressed the court and said, "Can I please represent myself . . . ." The defendant clearly and unequivocally stated that he wanted to represent himself, and the court responded by ruling that it would "not allow [him] to represent [himself]."

Once the defendant made his clear and unequivocal request for self-representation, the court was required to determine the timeliness of that request. In doing so, the defendant claims that the court improperly weighed the *Flanagan* factors, failing, in particular, to give suffi-

cient weight to his claim that no delay in the proceedings would occur as a result of his self-representation.

After our Supreme Court adopted the balancing factors test in *Flanagan*, it remanded the case for a determination of whether those factors weighed in favor of the defendant such that a canvass under Practice Book § 44-3 was required. The trial court then "issued a lengthy and thorough decision in which it concluded that 'the defendant's request for self-representation should be denied and . . . a Practice Book § 44-3 canvass need not be conducted.' " *State* v. *Flanagan*, 147 Conn. App. 262, 269, 82 A.3d 1191, cert denied, 314 Conn. 901, 99 A.3d 1170 (2013) (*Flanagan II*). The trial court thoroughly evaluated each factor. As to the first factor, the trial court said, " 'Although the reason for the defendant's desire to represent himself, to call witnesses, may be legitimate on its face, that does not automatically lead to the conclusion that this factor weighs in favor of the defendant's interest in self-representation.

" 'It is the trial court's duty to analyze the defendant's stated reason within the context of the trial. The decision to call witnesses does not stand alone. The decision to call witnesses and the potential effectiveness of such witness' testimony is a trial strategy decision. . . .

" 'Although there are basic rights that the attorney cannot waive without the fully informed and publically acknowledged consent of the client, the lawyer has— and must have—the full authority to manage the conduct of the trial.

" 'To allow a defendant's desire to call witnesses in contravention of an attorney's expert decision would create an atmosphere of disruption for the defendant, the state and the fact finder during the trial.

" 'In the case before the court, the defense counsel's strategy was explained to this court. Counsel indicated that the defendant's request to call the three witnesses would not advance the defense's theory of the case.' " Id., 273–74.

Finding the defendant's counsel competent, the court in *Flanagan* also determined that the second factor did not weigh in favor of the defendant. Id., 278. As to the third factor, the court found that it did not weigh either for or against the defendant because he had tried to have the same attorney removed as counsel one time before. Id. The court then looked at the potential disruption in the proceedings, noting first that the "defendant's request for self-representation came at the close of the state's case, and after the testimony of thirty-seven . . . witnesses, the introduction of ninety-two . . . state exhibits, seventy-five . . . defense exhibits, almost two weeks of evidence, and twenty-one . . . days of jury selection." (Internal quotation marks omitted.) Id., 279. The court also noted that some of the

witnesses whom the defendant wished to call had not been previously disclosed, and that he would have to locate some of the witnesses. Id. Although the defendant claimed that no delay would result from his request for self-representation, the court said that it was not bound by this assertion and did not credit it. Id.

On appeal, we affirmed the judgment of the trial court, reasoning that "the trial court considered the reason underlying the defendant's self-representation request. It conducted a thorough analysis of the defendant's stated rationale, namely, to call witnesses in his defense. . . . Ultimately, the court determined that the reason for self-representation advanced by the defendant did not weigh in his favor because it would not have been beneficial to the defense. The defendant appears to equate a 'legitimate' reason for self-representation with one that is not grounded in a desire to cause disruption or delay, but is genuinely advanced and is related to a legitimate right of a defendant in furtherance of his defense. We recognize that the court did not find that the defendant's request was not genuinely made or that it was made for the purpose of disrupting the proceeding. In fact, the court deemed the reason to be facially legitimate as it related to a fundamental right of a defendant to present a defense. Nonetheless, a defendant's right to conduct his own defense is 'not unqualified when that request is made after trial proceedings have commenced . . . .' *State* v. *Pires*, supra, 310 Conn. 251. There is no authority for the proposition that a reason related to a fundamental right, such as the right to present a defense, required the court to conclude that it weighed in the defendant's favor and to rule in his favor. It seems inconsistent with a proper analysis to conclude that the court was precluded from evaluating the nature of the evidence that the defendant wished to present to determine if it would have been admissible and beneficial to the defense such that the request justified a disruption in the trial proceeding in that it likely would have affected the outcome of the trial. In light of the broad discretion afforded trial courts in ruling on untimely requests for self-representation, there is no basis for us to conclude that the court's thorough analysis of the reasons underlying the defendant's request was arbitrary or improper." (Footnote omitted.) *State* v. *Flanagan*, supra, 147 Conn. App. 288–89.

In the present case, we can discern from the record that the trial court made the following findings as to the three *Flanagan* factors. As to the first factor, it concluded that the defendant wanted to represent himself because he had differences with his attorney as to trial strategy. Specifically, the defendant disagreed with how Hopkins was cross-examining the state's witnesses. The court noted that the questions he wished to have asked would be prejudicial to him and the answers to them inadmissible, much like the proposed

testimony of witnesses the defendant wished to call in *Flanagan II*, which the court said would "not [have] advance[d] the defense's theory of the case." (Internal quotation marks omitted.) Id., 274. As to the second factor, the court concluded that Hopkins was a capable lawyer, stating that he was "an experienced attorney" who was doing a "more than adequate job." The court did not make any findings as to the third factor, and the record does not reveal any evidentiary basis upon which the court could have concluded that the defendant had ever tried to substitute counsel prior to Attorney Hopkins. The court was aware of the defendant's dissatisfaction with Hopkins, as he had continuously expressed such dissatisfaction throughout the first day of trial.

The court made no mention of any " 'potential disruption of the proceedings already in progress' "; *State* v. *Flanagan*, supra, 147 Conn. App. 279; when it evaluated the defendant's second request for self-representation.[8] The defendant claims that he had not requested any delay and that no delay would have occurred if his request had been granted, although it would have been within the court's discretion to discredit this claim. See *State* v. *Bozelko*, 119 Conn. App. 483, 503, 987 A.2d 1102 ("The defendant suggests that no delay would have resulted from self-representation. The court, however, was not bound to believe that assertion."), cert. denied, 295 Conn. 916, 990 A.2d 867 (2010), cert. denied, U.S.    , 134 S. Ct. 1314, 188 L. Ed. 2d 331 (2014); see also *State* v. *Flanagan*, supra, 279.

In evaluating a request for self-representation made after a trial has commenced, however, the court is not required to find that a disruption of the trial will occur as a result of granting the request for self-representation. Instead, the trial court must weigh the three factors set forth in *Flanagan* and determine, on the basis of those factors, whether they provide a strong enough reason to justify the potential disruption in trial that might result in the course of a midtrial change in representation. If the trial court determines that the three *Flanagan* factors do not provide a strong enough reason to justify a potential disruption, it is not necessary for it to make a finding that a disruption in the proceedings will occur because the court has already determined that there is no benefit to be gained by granting the defendant's request for self-representation. If, on the other hand, the balance of those factors weighs in favor of a defendant's right to self-representation, he must be afforded that right, even if trial has already commenced.

Here, unlike in *Flanagan II*, we do not have the benefit of a thorough, written decision, and the trial court did not state whether each of the *Flanagan* factors weighed in favor of or against the defendant, nor did it address any potential disruption of the proceedings. Nevertheless, the trial court clearly considered the

relevant *Flanagan* factors in evaluating the defendant's request for self-representation and determined that the first factor, in particular, did not weigh in favor of granting his request. The trial court determined that the defendant's reasons for wanting to represent himself would ultimately waste the court's time and be prejudicial to the defendant. Accordingly, because the court determined that two of the *Flanagan* factors did not provide a strong enough reason to justify a potential disruption in the proceedings, the court was not required to make any finding as to whether a disruption would actually occur. We therefore find no basis to conclude that the trial court abused its discretion in denying the defendant's clear and unequivocal request for self-representation.

## II

The defendant next claims that the state violated his privilege against self-incrimination under the fifth and fourteenth amendments, which provide that no person shall be compelled in any criminal case to be a witness against himself. As a corollary to the privilege against self-incrimination, the United States Supreme Court held in *Doyle* v. *Ohio*, 426 U.S. 610, 617–18, 96 S. Ct. 2240, 49 L. Ed. 2d 91 (1976), that a state may not use a defendant's post-*Miranda* silence to imply that he is guilty of the crime charged. The defendant argues that the state violated *Doyle* in his case by using his post-*Miranda* silence and demeanor to imply that he had killed Javon Zimmerman.

The following additional facts are relevant to this claim. At trial, Patrick Meehan, a detective with the state police, testified that he had interviewed the defendant after his arrest on May 17, 2012, but that the defendant refused to allow the interview to be recorded. After advising the defendant of his *Miranda* rights, Meehan told him that he wanted to discuss the shooting of Javon Zimmerman at R.J.'s Café and the defendant's possible involvement in that shooting. The defendant told Meehan that he had been at R.J.'s Café at the time of the murder, that he had an altercation with Javon Zimmerman in the parking lot, and that he ran away after the altercation. When Meehan asked the defendant if he had murdered Javon Zimmerman, the defendant did not reply, and just gave "a blank stare" and shrugged.[9] Following his refusal to answer that question, the defendant continued to answer questions about whether he had touched the car that Javon Zimmerman had been in when he arrived at R.J.'s Café, and about his history with the Zimmermans. He also agreed to provide a DNA sample to the police.

The defendant testified on his own behalf. He told the jury about the ongoing feud he had with Javon Zimmerman, but explained that he had been trying to get out of the drug "game." The defendant described the events on the morning of Javon Zimmerman's murder as

follows. The defendant admitted that he was at R.J.'s Café on the evening of May 11, 2012, and into the morning hours of May 12. The defendant was watching from inside the entryway of the bar as Javon Zimmerman's car pulled into the parking lot, and he saw Tyquan Bailey get out of the car. The defendant walked outside and spoke briefly with Bailey, and they were then joined by the defendant's friend. As they were talking, Javon Zimmerman jumped out of the vehicle and started yelling at Bailey for speaking to the defendant and his friend. The defendant then heard gunshots, saw a flash, and took off running. Although the defendant denied being the shooter, he declined to name the person who had fired the gun, simply stating that it was his "boy."

During cross-examination, the prosecutor pressed the defendant about his refusal to provide the name of the person he allegedly saw shoot Javon Zimmerman. In particular, the prosecutor asked the defendant if, during the course of his four hours of questioning by police, he ever told them that he knew the identity of the real murderer. The prosecutor said, "When he asks you if you shot him, you don't say—" and the defendant interrupts to say, "Nothing." The prosecutor continued, "why does everybody keep pointing the finger at me? You don't say, I didn't do this. You don't say, this my life we're talking about. I got kids. I would never shoot somebody in the middle of a parking lot with witnesses around. You say none of that." The defendant agreed, stating, "I say nothing," explaining, "I didn't answer all of [Meehan's] questions because when he asked me what happened that night I told him I don't want to even get into that."

During its closing argument, the state mentioned the defendant's refusal to answer Meehan's question about whether he had killed Javon Zimmerman: "Interview with Detective Meehan. We don't have any audio or video of that; [the defendant] wouldn't allow it. But the important part about that, well, Detective Meehan stressed—you decide what is the important part. But Detective Meehan stressed, he is all over the place in the first part. The Zimmermans; the killers; they bring people up to pull the trigger. Javon you know was there, and on and on about that. Did you do it? The shrug basically told you what I did."

The defendant claims that the state improperly used his post-*Miranda* silence and demeanor to imply his guilt and that this constitutional violation was harmful. More specifically, the defendant alleges that the state's use of his failure to answer Meehan's questions about whether he had killed Javon Zimmerman violated the rationale of *Doyle*, which held that it is a violation of due process to use a defendant's post-*Miranda* silence to impeach him at trial. The state contends, however, that the defendant did not invoke his right to remain silent, and thus that no *Doyle* violation occurred. More-

over, the state argues, even if such a violation did occur, it was harmless error.

The defendant did not preserve this claim at trial and now seeks *Golding* review. Under *Golding*, "a defendant can prevail on a claim of constitutional error not preserved at trial only if *all* of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation . . . exists and . . . deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt. In the absence of any one of these conditions, the defendant's claim will fail." (Emphasis in original; footnote omitted.) *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989); see also *In re Yasiel R.*, 317 Conn. 773, 781, 120 A.3d 1188 (2015) (modifying third condition of *Golding*).

The defendant has alleged a constitutional violation and the record is adequate for review, and thus, he is entitled to *Golding* review. The defendant cannot prevail on his claim, however, because the third *Golding* condition is not met: The defendant did not invoke his right to remain silent, and thus the state's use of his post-*Miranda* silence did not constitute a constitutional violation. See *State* v. *Fluker*, 123 Conn. App. 355, 363, 1 A.3d 1216, cert. denied, 298 Conn. 931, 5 A.3d 491 (2010).

"The warnings mandated by [*Miranda* v. *Arizona*, 384 U.S. 436, 467–73, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966)], as a prophylactic means of safeguarding Fifth Amendment rights . . . require that a person taken into custody be advised immediately that he has the right to remain silent, that anything he says may be used against him, and that he has a right to retained or appointed counsel before submitting to interrogation. Silence in the wake of these warnings may be nothing more than the arrestee's exercise of these *Miranda* rights. Thus, every post-arrest silence is insolubly ambiguous because of what the State is required to advise the person arrested. . . . Moreover, while it is true that the *Miranda* warnings contain no express assurance that silence will carry no penalty, such assurance is implicit to any person who receives the warnings. In such circumstances, it would be fundamentally unfair and a deprivation of due process to allow the arrested person's silence to be used to impeach an explanation subsequently offered at trial." (Citations omitted; internal quotation marks omitted.) *Doyle* v. *Ohio*, supra, 426 U.S. 617–18.

In applying the rationale of *Doyle*, Connecticut appellate courts have found that a violation has occurred in two types of cases. First are cases in which the defendant has made it clear that he does not want to answer any questions relating to the commission of the crime.

Thus, in *State* v. *Morrill*, 197 Conn. 507, 529–31, 498 A.2d 76 (1985), the defendant approached the police to provide information regarding a murder, but refused to answer any questions about the nature of his information before having a deal in place with the state's attorney. The defendant did answer the police officer's background questions about his education and physical and mental condition. Id., 530. When the police officer asked him whether he had committed the murder, however, the defendant did not respond the first two times he was asked. Id., 530–31. The third time, he "sarcastically answered, 'No, is that what you want to hear?' " Id., 531. Our Supreme Court held that "[t]he testimony concerning the defendant's refusal to answer questions specifically implicating him in the crime was in effect an impermissible comment upon the defendant's exercise of his rights under the fifth amendment to remain silent and not to incriminate himself. The testimony was not necessary to explain the context of other statements . . . nor to rebut an unfounded inference that its absence might inspire. . . . The trial court therefore erred in admitting this evidence concerning the defendant's nonresponse to [the police officer's] accusatory inquiries."[10] (Citations omitted.) Id., 538; see also *State* v. *Bereis*, 117 Conn. App. 360, 378–79, 978 A.2d 1122 (2009) (use of defendant's refusal to answer any questions a *Doyle* violation, but harmless).

Second are cases in which the defendant has started to answer questions, and then clearly has invoked his right to remain silent and to stop answering questions. In *State* v. *Montgomery*, 254 Conn. 694, 712, 759 A.2d 995 (2000), the defendant was being questioned by police about a murder. The defendant answered questions about purchasing a rifle and about his prior interactions with the victim, but denied killing her. Id. When the police officer later asked him if the killing was premeditated or a crime of passion, "[t]he defendant did not respond verbally to [the] question, but tears welled up in his eyes, he began to shake and signaled for a nurse to terminate the interview. The police then asked the defendant no further questions." Id., 712. Our Supreme Court concluded that "[a]lthough the defendant initially responded to [the police officer's] questions, he subsequently decided to stop answering questions and terminated the interview. There is no question that the defendant, in concluding the interview, was invoking his right to remain silent."[11] Id., 715.

A *Doyle* violation does not occur, however, where the defendant has not invoked his right to remain silent or has remained "selectively silent," as in *State* v. *Talton*, 197 Conn. 280, 497 A.2d 35 (1985), and *State* v. *Taft*, 25 Conn. App. 149, 593 A.2d 973, cert. denied, 220 Conn. 918, 597 A.2d 343 (1991). In *Talton*, a police officer testified at the defendant's trial that he had interviewed him about an alleged sexual assault. The defendant answered questions about where he had been at

the time of the alleged assault and about his sexual history with the victim. *State* v. *Talton*, supra, 293. The defendant claimed that he had sexual relations with a woman other than the victim on the evening of the alleged assault, but refused to provide police with her name, saying, "I'd rather not tell you. I don't want to tell you." (Internal quotation marks omitted.) Id. Our Supreme Court held that *Doyle* was inapplicable because "the defendant did not remain silent after he was arrested and advised of his rights. After being given *Miranda* warnings, the defendant clearly chose to forego his right to remain silent. Once an arrestee has waived his right to remain silent, the *Doyle* rationale is not operative because the arrestee has not remained silent and an explanatory statement assuredly is no longer 'insolubly ambiguous.' By speaking, the defendant has chosen unambiguously not to assert his right to remain silent. He knows that anything he says can and will be used against him and it is manifestly illogical to theorize that he might be choosing not to assert the right to remain silent as to part of his exculpatory story, while invoking that right as to other parts of his story. While a defendant may invoke his right to remain silent at any time, even after he has initially waived his right to remain silent, it does not necessarily follow that he may remain 'selectively' silent. We need not, however, in this case, decide the boundaries of intermittent assertion of the right to remain silent because, as the trial court found, the defendant's expression of a disinclination to answer one question was not tantamount to any assertion of his fifth amendment right. The defendant talked freely with the two officers who arrested him. In response to their questions, he voluntarily discussed with them his version of the events of the evening in question. In refusing to divulge the name of his alleged companion, he merely said 'I'd rather not tell you. I don't want to tell you.' He did not ask that the interrogation be ended or indicate reluctance to answer other inquiries. Under these circumstances, because the defendant failed to invoke his fifth amendment right to remain silent, the evidence was neither impermissibly elicited nor improperly admitted." Id., 295–96.

*State* v. *Taft*, supra, 25 Conn. App. 149, is strikingly similar to the present case. In that case, police were interrogating the defendant about his receipt of a stolen car. Id., 151. During the interrogation, the defendant said that a man had given him the car and that he had been living in the car. Id. However, "[w]hen asked if he knew that the car was stolen, the defendant did not immediately answer but looked down, smiled, shrugged, smirked. The interrogation went on to other topics and eventually ended after about one hour." Id. This court held that the state's use of the defendant's selective silence did not violate the defendant's fifth and fourteenth amendment privilege against self-incrimination, reasoning as follows: "By speaking, the

defendant has chosen unambiguously not to assert his right to remain silent. He knows that anything he says can and will be used against him and it is manifestly illogical to theorize that he might be choosing not to assert the right to remain silent as to part of his exculpatory story, while invoking that right as to other parts of his story. While a defendant may invoke his right to remain silent at any time, even after he initially waived his right to remain silent, it does not necessarily follow that he may remain selectively silent. . . . [T]here must be some indication that the defendant has invoked the right to remain silent. . . . We do not view the defendant's response and gestures as an invocation of the right to remain silent. . . . We conclude that the defendant's statements were properly admitted, including [the police officer's] testimony regarding the defendant's gestures, and, therefore, a proper subject for prosecutorial comment in closing argument." (Citations omitted; internal quotation marks omitted.) Id., 152–53; see also *State* v. *Lytell*, 206 Conn. 657, 662–63, 539 A.2d 133(1988) (court properly admitted evidence of defendant's refusal to provide information about alibi witness where defendant continued to answer questions thereafter).

In the present case, we conclude that the state's use of the defendant's failure to answer questions about whether he killed Javon Zimmerman, asked in the midst of a police interview, was not a *Doyle* violation. The defendant remained selectively silent when asked if he had committed the crime, yet answered questions before and after about his relationship with the victim and his whereabouts on the morning of the victim's murder. Thus, unlike the defendant in *Morrill*, the defendant did not refuse to answer any questions about the crime, and in fact, was quite forthcoming about details relating to his relationship with the victim and his presence at the scene of the murder. See *State* v. *Morrill*, supra, 197 Conn. 529–31. This forthrightness, moreover, came after Meehan had told the defendant that the purpose of the interview was to discuss Javon Zimmerman's murder. The only detail that the defendant refused to discuss was the identity of the shooter.

The defendant urges us to conclude that this case is different from other cases of selective silence because the only question that the defendant refused to answer was the ultimate inculpatory question—did you kill Javon Zimmerman? The defendant claims that the use of his silence on this ultimate question violates the very essence of the privilege against self-incrimination. We disagree. The question asked of the defendant in *Taft* was also the ultimate inculpatory question of whether the defendant knew the car he had received was stolen. *State* v. *Taft*, supra, 25 Conn. App. 151. Here, as in *Taft*, there was no indication that the defendant was invoking his right to remain silent upon being asked that question. He continued to answer questions thereafter and

did not stop the interview, as had the defendant in *Montgomery*. See *State* v. *Montgomery*, 254 Conn. 711. We thus conclude that the state's use of the defendant's post-*Miranda* silence during direct examination, cross-examination, and in its closing argument was not a violation of his fifth and fourteenth amendment privilege against self-incrimination.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] General Statutes § 53a-54a (a) provides: "A person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person or of a third person or causes a suicide by force, duress or deception; except that in any prosecution under this subsection, it shall be an affirmative defense that the defendant committed the proscribed act or acts under the influence of extreme emotional disturbance for which there was a reasonable explanation or excuse, the reasonableness of which is to be determined from the viewpoint of a person in the defendant's situation under the circumstances as the defendant believed them to be, provided nothing contained in this subsection shall constitute a defense to a prosecution for, or preclude a conviction of, manslaughter in the first degree or any other crime."

[2] The sixth amendment provides that an accused in all criminal prosecutions shall have the right to representation by counsel. U.S. Const., amend. VI.

[3] The sixth amendment right to counsel is applicable to the states through the fourteenth amendment. *Gideon* v. *Wainwright*, 372 U.S. 335, 341, 83 S. Ct. 792, 9 L. Ed. 2d 799 (1963).

[4] See *Miranda* v. *Arizona*, 384 U.S. 436, 478–79, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

[5] The fifth amendment provides that no person shall be compelled in any criminal case to be a witness against himself. U.S. Const., amend. V.

[6] The fifth amendment privilege against self-incrimination is applicable to the states through the fourteenth amendment due process clause. *Malloy* v. *Hogan*, 378 U.S. 1, 6, 84 S. Ct. 1489, 12 L. Ed. 2d 653 (1964) ("[w]e hold today that the Fifth Amendment's exception from compulsory self-incrimination is also protected by the Fourteenth Amendment against abridgment by the States").

[7] It is not clear from the record what the defendant meant by "acing" his police records.

[8] When the defendant made his first purported request for self-representation, the court had mentioned the "procedural aspects" of it "being at the absolute eve of the trial and the witnesses being called [are] here to start . . . ."

[9] The defendant testified as follows:

"[The Prosecutor]: Eventually, do you ever ask him if he murdered Javon Zimmerman?

"[Meehan]: Yes, sir.

"[The Prosecutor]: What does he say?

"[Meehan]: He doesn't reply. He doesn't—he doesn't admit it or deny it. It's just a blank stare and—

"[The Prosecutor]: Is there any response to your question at all at that point?

"[Meehan]: Just some nonconfirmatory like shrugs.

"[The Prosecutor]: What do you tell him in terms of anybody who had come forward to point the finger at him? What do you tell [the defendant] with regard to people coming forward and pointing the finger, thus far five days after the shooting?

"[Meehan]: Well, we had said we had heard that there were witnesses that saw you do the shooting in the parking lot, and he just doesn't reply.

"[The Prosecutor]: No response?

"[Meehan]: No verbal response.

"[The Prosecutor]: No confirmation that he did it?

"[Meehan]: No.

"[The Prosecutor]: No denial that did it?

"[Meehan]: No denial.

"[The Prosecutor]: What happens next?

"[Meehan]: We get into a little bit further discussion about the car and, again, he said, he was adamant, he was not in the car. So, we asked him if

he would provide a DNA sample for some comparative testing, and he voluntarily gave that; he had no problem with that.

"[The Prosecutor]: Does he indicate a willingness to talk to you again?

"[Meehan]: He does. He was pretty cooperate with us. He just wouldn't answer any questions specifically with regard to that shooting. He would talk about history with the Zimmermans and after, and his kids and his kids' mother, and all of that, but he said he was concerned about it, sounded like his kids and their mother in New Haven. So, he said something to the effect of, I basically told you what happened. I need a couple of days to make sure that my family, my kids, and that girl in New Haven are safe, and then maybe I'll talk to you guys again."

[10] Our Supreme Court also held that the improper use of the defendant's silence against him constituted harmful error and remanded the case for a new trial. *State* v. *Morrill*, supra, 197 Conn. 539 ("We have previously noted that comment upon the silence of the accused as a prosecutorial technique is often a crooked knife, and one likely to turn in the prosecutor's hand. The infusion of harmlessness into error must be the exception, applicable in circumstances few and discrete, and to be sparingly employed. . . . The evidence in this case was largely circumstantial, involving a delicate exercise of the factfinding function of the jury. We cannot say, as we must in order to hold harmless an error of constitutional magnitude . . . that it is clear beyond a reasonable doubt that the jury would have returned a verdict of guilty absent this impermissible testimony . . . and we therefore conclude that the error in admitting it requires that the defendant be granted a new trial. [Citations omitted; internal quotation marks omitted.]).

[11] Our Supreme Court concluded that the constitutional violation in *Montgomery* was harmless. See *State* v. *Montgomery*, supra, 254 Conn. 718–19 ("We conclude that the *Doyle* violation in the present case was harmless beyond a reasonable doubt. The prosecutor did not attempt repeatedly to introduce evidence of the defendant's silence. Nor did the prosecutor mention that evidence during his closing argument. Instead, the prosecutor focused on the state's strong case against the defendant, including the incriminating responses that the defendant gave to the police before terminating the interview with Lombardo. Furthermore, the other evidence introduced by the state overwhelmingly demonstrated the defendant's guilt beyond a reasonable doubt.").

———————————————